63

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOSE RAUL CASTILLO, | § | |
| *et al.*, | § | |
| Plaintifffs, | § | |
| | § | |
| V. | § | |
| | § | |
| CAMERON COUNTY, TEXAS | § | NO. B-93-260 |
| Defendant and | § | |
| Third-Party Plaintiff, | § | |
| V. | § | |
| | § | |
| THE STATE OF TEXAS, | § | |
| Defendant, | § | |
| and | § | |
| ANN RICHARDS, *et al.*, | § | |
| Third-Party Defendants | § | |
| and Defendants. | § | |

United States District Court
Southern District of Texas
FILED

AUG 18 1994

Michael N. Milby, Clerk

## DEFENDANT THE STATE OF TEXAS' AND
## DEFENDANTS AND THIRD-PARTY DEFENDANTS
## ANN RICHARDS, ET AL.'S
## RESPONSE TO PLAINTIFFS' POST-HEARING
## BRIEF ON PRELIMINARY INJUNCTION
## AGAINST STATE DEFENDANTS

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COME the State of Texas, Ann Richards, Governor of Texas, James A. Collins, Executive Director of the Texas Department of Criminal Justice ("TDCJ"), Carol S. Vance, Jerry H. Hodge, Joshua W. Allen, Sr., Thomas Dunning, Allan B. Polunsky, R. H. Duncan, Sr., Ellen J. Halbert, and John R. Ward, members of the Texas Board of Criminal Justice ("State Defendants"), by and through their attorney, Dan Morales, Attorney General of Texas, and file this their Response to Plaintiffs' Post-Hearing Brief on Preliminary Injunction against State Defendants.

# I.

## A.    Deliberate Indifference

### 1.    State Defendants' Knowledge of Conditions in the Jail

Plaintiffs first argue that State Defendants may be held deliberately indifferent even though they did not receive notice of cruel conditions in the Cameron County [jail] from monitors' reports.  State Defendants' point in their reponse to the motion for a preliminary injunction, to which plaintiffs are responding, was not that monitor reports *per se* were essential to a finding of deliberate indifference but that State Defendants' had to receive *some* information from *some* source from which they could reasonably infer cruel conditions in the jail.  *See Farmer v. Brennan*, ___ U.S. ___, U.S.L.W. 4446, 4449 (June 6, 1994) (to be deliberately indifferent under *Wilson Seiter*, ___ U.S. ___, 111 S.Ct. 2321 (1991), an official must actually know of a disregard an excessive risk to inmate health or safety).  In *Alberti v. the Sheriff of Harris County v. Richards*, 937 F.2d 984, 998 (5th Cir. 1991), *cert. denied*, ___ U.S. ___, 112 S.Ct. 1994 (5th Cir. 1992), the notice came from jail monitors' reports.  The absence of such reports - and any other information that conditions in the jail were cruel - distinguishes this case from *Alberti*.

Plaintiffs seem to attempt to establish that State Defendants had the required knowledge by pointing to "the uncontroverted testimony of Cameron County officials that they begged the State Defendants to accept more paper-ready prisoners to alleviate overcrowding *before* the suit was filed. . ."  This does not suffice.  While Cameron County officials may have asked state officials to try to bring the jail population down below design capacity, none of them testified at the preliminary injunction hearing [that] they apprised state officials of cruel conditions in the jail.  Indeed, when asked, they denied that they conveyed such information to the State (sometimes denying also [that] the conditions were cruel).  Cruel conditions cannot be inferred from "overcrowding in the sense of exceeding design capacity.  *Rhodes v. Chapman*, 452 U.S. 337, 349 [

2

n. 15, 101 S.Ct. 2392, 2401 n.15 (1981).  But under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, ___ U.S. at ___, 62 U.S.L.W. at 4449.  Plaintiffs have pointed to no evidence that State Defendants were apprised of facts from which to draw an inference of cruel conditions before the preliminary injunction hearing, much less that they actually drew such an inference.

Plaintiffs say, though, that State Defendants received notice of cruel conditions from this lawsuit and yet "refuse to act."  The plaintiffs' evidence of cruel conditions was sharply disputed.  This is another area of distinction between this case and the *Alberti* case: in *Alberti*, both the State and County defendants admitted at trial that the conditions in the jail were cruel.  *Alberti*, 937 F.2d at 998.  Here the situation is not so clear.  State Defendants' expert, Gary DeLand, testified that he saw no evidence that inmates' needs were being systematically denied in the Cameron County jail and that further investigation would be required to see whether crowding (in the sense of exceeding design capacity) has contributed to inmate violence, etc.  The testimony of Dr. Stern that only luck has prevented a tuberculosis epidemic is essentially speculation.  Sleeping on the floor is not a constitutional violation *per se*, even for pre-trial detainees, *Mann v. Smith*, 796 F.2d 79, 85 (5th Cir. 1986), and having to stand for hours in a holding cell (assuming this is true), while certainly uncomfortable, would not seem to be the sort of serious deprivation of basic human needs that is the concern of the Eighth Amendment.  *See Wilson v. Seiter*, ___ U.S. at ___, 111 S.Ct. at 2327.  (Nor would it be proscribed "punishment" under the Fourteenth, since it would be reasonably related to a legitimate non-punitive governmental objective, namely, to hold inmates safely until they can be properly assigned to a cell.  *See Bell v. Wolfish*, 441 U.S. 520, 538-39, 541-44, 99 S.Ct. 1874, 1876 (1979))

## 2.    State Defendants' Response to County Jail Crowding

But assuming *arguendo* that conditions in the jail are cruel and that they were shown to be so at the hearing, State Defendants' response to crowding in the Cameron County jail and in other county jails, which was initiated before the hearing, and, indeed, before this lawsuit, is precisely the kind of reasonable response that precludes a finding of deliberate indifference.[1]  State Defendants are in the process of doubling their prison population, already, at 77,000, the second largest in the nation, in the span of *one year*.  When this construction program is completed, Texas will have the largest prison population in the *world*.  This effort is truly unprecedented, eclipsing even the prodigious efforts that were going on at the time of the decision in *In re: Clements*, 881 F.2d 145 (5th Cir. 1989).

This ongoing construction program does not just mean, as plaintiffs assert, that relief will come eventually to the Cameron County jail.  It is coming now and will continue to come.  The testimony of Cathy McVey at the hearing was that, as a result of new prisons coming on line, 189 prisoners above Cameron County's normal allocation will be removed from the jail between the time of the hearing and September, 1994.

In addition, as plaintiffs must acknowledge, the State has provided funding for the construction of 192 emergency summer relief beds in Cameron County.  Plaintiffs complain that the jail will still be 58 persons over its total design capacity after these beds are added.  Here they stubbornly cling to the idea that constitutional capacity

---

[1]  In this connection, State Defendants do not dispute the holding in *Alberti* that, at least until the Texas supreme court says otherwise, they are charged with primary (but not exclusive) responsibility for paper-ready inmates in county jails.  Rather, the question is whether State Defendants' response has been sufficient to meet that responsibility.  The *Alberti* court does *not* say that the only way to discharge that responsibility is to immediately remove all paper-ready felons from the jail.

equals design capacity, or, in fact, 85% of design capacity.[2]  This is contrary both to the caselaw and the testimony at the hearing from Mr. DeLand that the addition of the 192 beds should alleviate any problems the jail is now experiencing from excess numbers of inmates.  Moreover, given the increased intake this summer from new prisons coming on line, the Cameron County jail should go below its design capacity very soon, especially if the County will finally make vigorous use of the parole-in-absentia (PIA) program.

Another element of the State's response is the funding it has provided to the County since September, 1991.  Plaintiffs assert that this money is limited to providing "guards, food, utitlities, medical care, etc."  They fail to cite to any statute that limits the money paid to counties under Chapter 499 of the Texas Government Code to such operational items or forbids their expenditure on facilities.  The evidence at the hearing showed that Cameron County has essentially made a substantial profit off the money the State has given it.  That surplus could and should have been used to provide better conditions for inmates, be it in the form of increased bed space, more guards, or enhanced medical care.  Any of these measures could have alleviated the alleged cruel conditions that plaintiffs say exist in jail.  Furthermore, if the County had been diligent in processing convicted felons' paperwork and had made them paper-ready in a timely manner, it could have realized *a million dollars more* in state aid.  That was surely enough to build a facility to alleviate allegedly cruel conditions.   (There is also

---

[2]  It is curious that plaintiffs insist on holding the jail at 85% of design capacity when the state prison system was for years held at 95% of court-ordered capacity (higher than design capacity) under the former *Ruiz* consent decree, *Ruiz v. Lynaugh*, 811 F.2d 856, 857 (5th Cir. 1987), and now operates at 100% of court-ordered capacity (and more than 100% of design capacity) under the *Ruiz* Final Judgment.  Final Judgment in *Ruiz v. Collins*, No. H-78-987 (S.D. Tex., Houston Div.) (entered into evidence at the preliminary injunction hearing) at 12, 13-19; 37 TAC §§ 152.11-152.12 (West 1994).  The relief plaintiffs request would place the state prison system *above 100%* of capacity.

evidence that the County held on to jail construction bond money it already had for a long period of time before seriously attempting to expand its jail facilities.)

Finally, the State has responded to problems in the Cameron County jail and others by offering counties the opportunity to transfer inmates with serious health problems to state prison above and beyond the transfers authorized under the allocation formula. Thus, inmates with active tuberculosis, for example, can be transferred to state prison over and above the allocation formula. Testimony of Cathy McVey. State Defendants cannot effectuate these transfers without the County's identification and referral of these inmates. This is another instance in which the State has responded, but the County has failed to take advantage of the response. According to Ms. McVey, Cameron County has never attempted to take advantage of the medical transfer policy, even though TDCJ has communicated that policy to all counties.

Hence, assuming *arguendo* that the conditions in the jail are cruel and that the relevant state officials have had the requisite knowledge of those conditions, State Defendants' actions have constituted a reasonable response to those conditions that precludes any finding of deliberate indifference. Indeed, it is hard to see what more State Defendants could have done besides waive the allocation formula for Cameron County and take all the paper-ready inmates at once, which plaintiffs concede to be forbidden under state law. *See* TEX. GOV'T CODE ANN. § 499.072 (Vernon Supp. 1994), Plaintiffs' Post-Trial Brief at 7.[3]

--------------------------------------------------

[3]   Plaintiffs suggest that if the Court finds the Cameron County jail to be unconstitutionally overcrowded and caps the population of the jail, it should order State Defendants to take prisoners in excess of the court's cap under TEX GOV'T CODE ANN. 499.125 (Vernon Supp. 1994). However, the Court has no jurisdiction to enforce this state law against State Defendants. *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900 (1984). The most it could do would be to declare the jail unconstitutionally overcrowded and impose a cap. After that the Texas Commission on Jail Standards would have to decide whether to issue an order transferring inmates out of the jail to some other facility. TEX. GOV'T CODE ANN. § 499.125(a) (Vernon Supp. 1994). ("[T]he commission" obviously refers to the

State Defendants' response, especially the funding of the 192 beds, counsel particularly against the entry of preliminary injunctive relief.  With respect to permanent injunctive relief, the Fifth Circuit has held that "superintending federal injunctive decrees directing state officials are appropriate only when constitutional violations have been shown *and* when the state officials are demonstrably unlikely to implement the required changes without its spur." *Morrow v. Harwell*, 768 F.2d 619, 627 (5th Cir. 1985).  The rationale behind this rule is that "in all cases implicating state/federal relations, federal courts ought to intrude into state affairs no more than is absolutely necessary." *Id.* at 628.  It seems that these principles concerning the entry of permanent injunctive relief after a definitive adjudication of constitutional violations would apply with even more force to preliminary injunctions, where the court has not even decided the merits of the case.  Even if it is assumed that there are constitutional violations in the jail now, it is extremely doubtful that there will be any after the addition of the 192 beds.  It thus is not "absolutely necessary" for the Court to intervene now to make the State do more than it is doing.  Principles of federalism that would compel the Court to "wait and see" even if it is assumed that plaintiffs showed that constitutional violations existed in the jail in the past. *See Ruiz v. Estelle*, 679 F.2d 1118, 1145-1148, esp. at 1148 (5th Cir. 1982), *modified on other grounds*, 688 F.2d 266 (5th Cir. 1982), *cert. denied*, 460 U.S. 1042, 103 S.Ct. 1438 (1983) ("wait and see" approach ensured "that the intrusion into state processes would be no greater than that required to achieve compliance with the Constitution).

---

Commission on Jail Standards.)  If it did, then TDCJ would come into the picture and make the necessary contracts with any entities that agreed to receive the inmates in their facilities. TEX. GOV'T CODE ANN. § 499.125(b)(1) (Vernon Supp. 1994); *see* TEX. GOV'T CODE ANN. § 491.001(a)(1) ("board" means the Board of Criminal Justice).

CutePDF - www.fenito.com

**B.**   *In re: Clements*

Plaintiffs argue that the Fifth Circuit's decision in *In re: Clements*, 881 F.2d 145 (5th Cir. 1989) does not preclude an order compelling State Defendants to accept all of Cameron County's paper-ready inmates into the state prison system as soon as Cameron County is ready to send them.  Their main argument is that the number of inmates involved, about 300 now and then whatever number of paper-readies the County generates thereafter, is insufficient to have a direct and substantial effect on the state prison system and that an order to take all those inmates immediately hence would not run afoul of *Clements*.  But if TDCJ-ID runs at its maximum capacity now, compelling it to accept 300 inmates would put it over its court-ordered limit and thus in violation of the *Ruiz* Final Judgment.  This certainly would be a direct and substantial impact on the state prison system.

Plaintiffs also downplay the fact that even if TDCJ-ID could accomodate an order in one small or medium-size county requiring the immediate transfer to state prison of all paper-ready inmates, the allocation system would break down completely if that order were to be repeated in all other similarly situated counties.  Plaintiffs' response is that there is no evidence that other counties are unconstitutionally overcrowded.  Here the plaintiffs contradict themselves.  They claim that State Defendants should have inferred unconstitutionality from the mere fact that the population of the Cameron County jail exceeds its design capacity.  In fact, they claim that the jail must be presumed to be unconstitutional if it exceeds 85% of design capacity, insisting that a facility must operate at less than design capacity for there to be sufficient classification to protect inmate safety (contrary to the testimony of Gary DeLand).  Yet State Defendants presented evidence that there are a number of other jails in Texas where the population exceeds design capacity *more* than it does in the Cameron County jail.  Nevertheless, plaintiffs now say that it cannot be inferred from

8

this "overcrowding" that these jails are unconstitutional and subject to the same sort of order that plaintiffs seek from this Court.

State Defendants' position is that one cannot infer unconstitutionality from the mere exceedance of design capacity. But if Cameron County and the inmates in its jail manage to obtain special treatment from the federal courts in terms of their admissions to state prison, that would certainly encourage other counties and inmates to attempt to get the same thing. That would lead to the complete breakdown of the allocation process and a chaotic situation that would benefit no one.

The Fifth Circuit is sensitive to this concern. It has not limited its application of *Clements* to the Harris County jail. Nor has it limited its application of *Clements* to situations in which thousands of inmates are involved. In a case which has now been settled and dismissed, *In re: Travis County Jail Conditions*, No. A-80-CA-157 (W.D. Tex., Austin Div.) ("*In re: Travis County*"), the Magistrate Judge issued a preliminary injunction order requiring State Defendants to accept 226 inmates backlogged in the Travis County jail and at least 29 inmates each week. **Exhibit A**, Ruling on Preliminary Injunction Motions in *In re: Travis County*. State Defendants sought a writ of prohibition from the Fifth Circuit forbidding the enforcement of this order, arguing, among other things, that the order would have a direct and substantial effect on happenings in the state prison system and thus violated *Clements*. **Exhibit B**, State Defendants' Petition for a Writ of Prohibition and Mandamus, or, in the Alternative, Motion for Summary Reversal.[4] The Fifth Circuit granted the writ of prohibition pending appeal.[5] **Exhibit C**. This indicates that the Fifth Circuit considered a transfer order involving even smaller numbers of inmates than at issue here to have a "direct

---

[4] State Defendants adopt and incorporate herein as part of their argument the arguments made in section A.2 of that pleading, pages 12-19, relating to the conflict of that order with *Clements*, so far as they may now be applicable.

[5] The appeal was later dismissed because of the settlement of the case.

and substantial effect" on the state prison system and thus to be beyond the jurisdiction of any court other than the *Ruiz* court. *Clements* clearly deprives this Court of jurisdiction to issue any order interfering with TDCJ's admission policies, since any such order is bound to have a direct and substantial effect on the state prison system.[6]

## II.

## REQUEST FOR RELIEF

For the foregoing reasons, State Defendants request that the Court deny all preliminary injunctive relief against them. State Defendants further request any other relief to which they may be entitled or which the Court may find just, equitable or proper.

Respectfully submitted,

DAN MORALES
Attorney General of Texas

JORGE VEGA
First Assistant
  Attorney General

DREW T. DURHAM
Deputy Attorney General
  for Criminal Justice

ANN KRAATZ
Assistant Attorney General
Chief, Law Enforcement Defense Division

---

[6] If it were necessary to transfer inmates out of the Cameron County jail to make it constitutional - which State Defendants deny - a court order requiring TDCJ to transfer inmates to other county jails would intrude too much by failing to respect state processes, since a declaration of unconstitutional overcrowding and the imposition of a cap would be sufficient to set in motion the state mechanism designed to accomplish such transfers, which is established by TEX. GOV'T CODE ANN. § 499.125 (Vernon Supp. 1994). *See Morrow*, 768 F.2d at 627-28.

*Attorney-in-Charge

ROBIN SANDERS*
Assistant Attorney General
Assistant Chief, Law Enforcement
  Defense Division
State Bar No. 09310900


JOHN B. WORLEY
Assistant Attorney General
State Bar No. 22001480


P.O. Box 12548, Capitol Station
Austin, Texas  78711-2548
(512) 463-2034
(512) 463-2084 (FAX)

ATTORNEYS FOR
STATE DEFENDANTS

11

## CERTIFICATE OF SERVICE

I do hereby certify that the foregoing Defendants and Third-Party Defendants the State of Texas, et al.'s Response to Plaintiffs' Post-Hearing Brief on Preliminary Injunction against State Defendants will be served by United States Mail on the $/5$ day of August, 1994 to LUIS V. SAENZ, Cameron County District Attorney, and RICHARD O. BURST, Assistant County Attorney, 974 E. Harrison St., Brownsville, TX 78520; ED STAPLETON, Costilla & Stapleton, P.C., 1325 Palm Boulevard, O. Drawer 4417, Brownsville, TX 78520; JUAN JOSE MARTINEZ, P. O. Box 809, Brownsville, TX 78520; and CARTER C. WHITE, 252 Juanita Way, San Francisco, CA 94127.

JOHN B. WORLEY
Assistant Attorney General

rs07224.cc

12

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOSE RAUL CASTILLO, *et al.*, | § § | |
| Plaintifffs, | § § | |
| V. | § § | |
| CAMERON COUNTY, TEXAS | § | NO. B-93-260 |
| Defendant and Third-Party Plaintiff, | § § | |
| V. | § § | |
| THE STATE OF TEXAS, | § | |
| Defendant, | § | |
| and | § | |
| ANN RICHARDS, *et al.*, | § | |
| Third-Party Defendants and Defendants. | § § | |

## EXHIBIT A

## TO

## DEFENDANT THE STATE OF TEXAS' AND DEFENDANTS AND THIRD-PARTY DEFENDANTS ANN RICHARDS, ET AL.'S RESPONSE TO PLAINTIFFS' POST-HEARING BRIEF ON PRELIMINARY INJUNCTION AGAINST STATE DEFENDANTS

Case 1:93-cv-00260   Document 63   Filed in TXSD on 08/18/1994   Page 14 of 60

Clerk, U. S. District Court
Western District of Texas

By SrU

Deputy

RECEIVED

SEP 27 1989

RUIZ TEAM

# IN THE UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF TEXAS

### AUSTIN DIVISION

IN RE:  TRAVIS COUNTY JAIL    ()    CAUSE NO. A-80-CA-13989

## RULING ON PRELIMINARY INJUNCTION MOTIONS

### I.  Introduction

Before the Court this day are the Plaintiffs' Motion for a Second Preliminary Injunction, the County Defendants' Motion for Preliminary Injunction, and the State Defendants' Response.

After receiving those motions, this Court issued an "Order and Notice of Setting" eliminating from consideration, at this time, some of the requests in the preliminary injunction motions. The request by the proponents for the preliminary injunction were further limited in their oral presentations.  The County Defendants (Doyne Bailey, the Sheriff of Travis County and the County Judge and the Commissioners' Court of Travis County) request:  (1) that the Texas Department of Criminal Justice (TDCJ) take twenty-nine (29) TDC-ready inmates each week pursuant to the TDCJ's  mandated Scheduled Admission Policy; (2) that TDJC take all of the alleged two hundred twenty-six (226) sentenced, awaiting transfer inmates that have been backlogged in Travis County Jail since the implementation of the Scheduled Admission Policy in October, 1987; and (3) that the Court impose sanctions against the State Defendants in the amount of $40.00 per day per inmate not taken in the past or in the future under the Scheduled Admission Policy.

1

438

The plaintiffs request in their preliminary injunction motion that: (1) the TDJC take twenty-nine (29) inmates per week; (2) that the TDJC refrain from refusing to take that weekly allotment of inmates from the Travis County Jail; (3) that the TDJC establish a plan to accept and remove the backlogged inmates accumulated since the implemention of the Scheduled Admission Policy; and (4) that the State Defendants be held in contempt and fined $100 per day per inmate, $50 going to Travis County and $50 to the particular inmate that is sentenced, awaiting transfer, and has not been transferred to the TDJC.

II.  Procedural History

Before ruling specifically on the contentions before the Court in this hearing, a short synopsis of the history of the case may assist the parties and others in their understanding of this Order.  The original lawsuit was filed in 1972 by a number of inmates housed in the Travis County Jail.  The inmates allege that the jail violated both state jail standards and the United States Constitution.  The original lawsuit, Musgrove v. Frank led to a number of findings, and it was eventually combined with an additional lawsuit filed in 1980.  The 1980 lawsuit contained some of the same allegations and gave this lawsuit its "new" 1980 number.

On July 31, 1974, United States District Judge Jack Roberts entered an interim order, finding that the Travis County Jail did not comply with numerous state statutes.  On October 9, 1974, U.S. District Judge Jack Roberts issued an order, finding that the Travis County Jail did not comply with the First, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.  An additional

2

order by Judge Roberts on November 8, 1976, continued to find both state and federal violations and found that the majority of the problems were caused by "the facility itself."

On October 30, 1981, the presiding U.S. Magistrate, Philip E. Sanders, issued a lengthy order, dealing in great detail with a number of the problems. Specifically, he found at page 12, paragraph 2, subsection c, that "once the new jail [planned for construction at that time] is occupied, the old Travis County Jail is not to be inhabited without renovation and compliance with the Texas Commission on Jail Standards requirements for county facilities." At page 16, paragraph II, Magistrate Sanders ordered the County to comply with all standards issued by the Texas Commission on Jail Standards and "not seek variances as to conditions deemed by the Commission to permit or create unhealthy, unsanitary or unsafe conditions."

On May 20, 1982, Judge Sanders set a hearing on Plaintiff's Motion for Non-compliance with the 1981 Order. In that May 20, 1982 Order, Judge Sanders acknowledged allegations that much of the problems and overcrowding in the jail were caused by "the actions of the Texas Department of Corrections." On June 9, 1982, an interim order was issued, again specifying in great detail the jail population as a whole, the jail population by each tank, and ordering the closure of numerous tanks in the old Travis County Jail because of their unsafe and unsanitary conditions. On June 18, 1982, Judge Sanders issued another lengthy order regarding the closure and repair of tanks, the hiring of staff, and the training of staff and medical personnel for both the old Travis County Jail and the new Travis County Jail which was in construction.

Finally, on September 9, 1987, an agreed order was entered and approved by Judge Sanders requiring that the Travis County Jail system be operated under the provisions of the October 30, 1981 Court Order "until the old jail is either brought into compliance with minimum jail standards without variances or until inmates are no longer occupying said facility."

This Court, itself, entered an order on October 21, 1988, in response to a hearing on motion for contempt. In that order, the Court made no specific findings with regard to contempt against any of the County Defendants, but the Court found that the situation had again reached the point at which remedial orders were necessary to enforce the previous orders, issued by U.S. District Judge Jack Roberts and former U.S. Magistrate Philip Sanders, which were designed and intended to eliminate the unconstitutional "old" Travis County Jail, still currently used to house prisoners in Travis County. In the October 21, 1988 Order, this Court required the "old" Travis County Jail to be closed on or before December 1, 1990, and implemented a depopulation schedule to monitor the County Defendant's progress to that end.

After hearings on November 3, 1988, this Court granted the plaintiffs' motion to file a supplemental complaint and County Defendants' motion to join additional party defendants, allowing the County Defendants and Plaintiffs to pursue claims against the State Defendants in this cause.

The State Defendants, now a party to the lawsuit, are the subject and focus of both the county defendants' and plaintiffs' motions for preliminary injunction. This Court, therefore, on the 25th

4

day of August, 1989, set certain portions of the preliminary injunction motions for hearing.

Having considered the plaintiffs' Motion for Preliminary Injunction and the County Defendants' Motion for Preliminary Injunction, together with their memoranda, affidavits, evidence and oral arguments in support thereof, and the State Defendants memoranda, affidavits, evidence and oral arguments in opposition thereto, and keeping in mind the four traditional criteria that must be satisfied by the proponents for a preliminary injunction to properly issue: (1) a substantial likelihood that the proponents will prevail on the merits; (2) a substantial threat that the proponents will suffer irreparable injury if the preliminary injunction is not granted; (3) whether the threatened injury to the proponents outweighs the threatened harm to the defendants; and (4) whether granting of the preliminary injunction will not disserve the public interest, this Court is of the opinion and finds that the plaintiff's Motion for Preliminary Injunction and the County Defendants' Motion for Preliminary Injunction are meritorious and should be granted in part.

III.  Current Status

The State Defendants, in their opposition to the preliminary injunction motions, have indicated that the conditions in the "old" Travis County Jail must be relitigated.  They have also indicated that the continuing jurisdiction of U.S. District Judge William Wayne Justice in the Ruiz v. Lynaugh litigation, and the recent decision by the U.S. Court of Appeals for the Fifth Circuit in In Re: William P. Clements, as it pertained to the Alberti litigation in Harris County, preclude continuing this litigation in its present status.  This Court

CUtePDF - www.tevolo.com

has considered these defenses to these motions and finds them inappropriate.

The issue before this Court is <u>not</u> whether the Travis County Jail is unconstitutional, but whether the County is in a position of contempt for failure to comply with the outstanding orders of this Court. The constitutionality of the "old" Travis County Jail was decided over ten (10) years ago in protracted litigation before U.S. District Judge Jack Roberts. The County has made continued strides to alleviate those unconstitutional conditions and by all the parties' admissions, the actual conditions of incarceration in the "old" Travis County Jail have improved considerably; however, the "facility," itself, its physical plant, has not been renovated to comply with this Court's previous orders.

Thus, the current issue at the preliminary injunction hearing is not whether those improved conditions are constitutional or not. The issue is whether Travis County has complied with and will be able to continue to comply with the specific orders and remedial requirements of this Court. The conditions in the "old" Travis County Jail speak, if at all, in this situation, to the third test for the issuance of a preliminary injunction, i.e., the balancing of the equities. To now argue to this Court that since the conditions have vastly improved the unconstitutional facility is "constitutional and suitable for long-term habitation of inmates" misses the mark, both judicially and logically. The County Defendants and Sheriff are under order to close that facility and that order shall remain in effect. To now argue that because the conditions of habitation are improved, and this Court's order is no longer effective, are as illogical and ludicrous as

arguing that since the TDJC has made great strides to eliminate building tenders and overcrowding in the Texas Department of Corrections, that Judge Justice's orders under <u>Ruiz</u> no longer require compliance. The State Defendants have been ordered to proceed in a specific manner in the <u>Ruiz v. Lynaugh</u> suit; the Travis County Defendants have been ordered to proceed in a specific manner in <u>this</u> litigation.

## IV.   <u>Traditional Criteria</u>

Reviewing the traditional criteria that must be satisfied for a preliminary injunction to issue, the Court has taken the following into consideration:

I.   Substantial likelihood that the proponents will prevail on the merits.

The traditional view of a preliminary injunction is altered by the procedural aspects of this case. The "merits" of this case do not include the constitutionality of conditions in the Travis County Jail. The "merits" in this case now include the duties and responsibilities of the County to carry out this Court's order, and the duties of the defendant   TDCJ (as well as the specifically named cross-defendants) to take prisoners sentenced and awaiting transfer to the TDCJ.

After reviewing all the evidence presented, this Court finds that no ruling is necessary on the specific issue of the legal duty of the State Defendants in order to issue this particular preliminary injunction.   (The legal duty of the State Defendants is presently being litigated in state court in the <u>Nueces County</u> litigation and may, or may not, be an appropriate matter for this federal court to rule upon.) The State Defendants have, through their evidence, presented

7

details with regard to the promulgation and application of the Scheduled Admission Policy and the new impact that recently-passed House Bill No. 2335 might have on that policy. The Texas Department of Criminal Justice began the Scheduled Admission Policy in October, 1987, and soon thereafter, Travis County's weekly allotment was set at 29 inmates per week. Testimony from witnesses and evidence presented in the form of affidavits and exhibits, shows that this policy was arrived at after careful calculations by the Texas Department of Corrections, the Texas Board of Pardons and Paroles, the Governor's Office, the Legislative Budget Board, and other state officials in an attempt to assure that the State of Texas would comply with the specific rulings of the U.S. District Court in Ruiz v. Lynaugh. The rulings of the Ruiz Court have not changed for some time, and the State is on a pattern to fully comply with those rulings, using the Scheduled Admissions Policy. This Court is aware that numerous counties object to the specific numbers allocated to them and to the manner in which their allotments are computed, but those disagreements have nothing to do with the mandatory nature of the allotment and the fact that the State of Texas and the TDCJ, itself, set that amount.

Without specifically ruling on any legal duty on behalf of the State, in all likelihood the movants of this preliminary injunction would prevail on the issue of whether the actions of the State interfere with the enforcement of this Court's orders; therefore, the State Defendants would have some obligation to take specific action to insure that this Court's orders are met.

8

2. A substantial threat that the movants' will suffer irreparable injury if the preliminary injunction is not granted.

This criteria must also be viewed in a somewhat non-traditional manner since the irreparable harm to the County Defendants is different than the irreparable harm to the inmate plaintiffs. The County Defendants have shown that since the original orders of the Court in 1976, the capacity of the Travis County Jail System has increased 300+%. The Commissioners' Court must presently house and pay for inmates sentenced to the Texas Department of Corrections and awaiting transfer to the TDC. In the past, and, but for the Scheduled Admission Policy, those inmates WERE under the care and custody of the State of Texas in a correctional facility owned by the State operated by it, carrying the name Texas Department of Corrections. Financially, the tax payers of Travis County are paying additional county taxes to house, feed and attempt to rehabilitate inmates that are allegedly the responsibility of the State of Texas. Travis County citizens also pay state taxes to house, feed and rehabilitate state prisoners. Travis County citizens, therefore, must pay more than their ordinary share to house convicted felons that traditionally has been the state's responsibility.

The Plaintiff Inmates now serve most of their state sentences county correctional facilities that are not designed, constructed or intended for long-term incarceration and rehabilitation. The standards for a short-term county correctional facility, even if it complies with all standards of the Texas Commission on Jail Standards and federal laws, are not the same as those required of TDCJ facility under the Ruiz v. Lynaugh order. The inmates in the Travis County

correctional facilities do not receive the education, rehabilitation, training, or consideration for parole in a manner that matches the quality or speed with which inmates housed in TDCJ facilities receive those benefits. Additionally, the small number of plaintiff-inmates that reside in the "old" Travis County Jail reside in an unconstitutional facility that does not comply with the Texas Commission on Jail Standards conditions or the conditions set forth in Ruiz v. Lynaugh.

In summary, the irreparable injury therefore takes the form of increased taxes, a readjustment of where taxes must be spent, and the lack of rehabilitative services to the inmates that, in the end, again, affect the taxpayers.

3. Whether the threatened injury to the movants outweighs the threatened harm to the defendants.

The harm to the movants is two-fold: (1) increased financial burden, and (2) lack of rehabilitation. The increased financial burden affects the citizens of Travis County. The injuries to members of the public through the decisions of the Commissioners' Court, as the Commissioners comply with this Court's orders and are required to reevaluate expenditures for other services demanded by the citizens, is a more direct and meaningful injury to the citizens of Travis County.

Considering rehabilitation to be the primary purpose of a correctional system, and deterrent and punishment to be secondary in nature, both issues show an injury to the inmates that outweighs any injury to the State Defendants. With less rehabilitative services, those inmates that desire to move out of the system and be productive members of the society, are deprived of equal and necessary

rehabilitative opportunities. Those inmate-plaintiffs that spend the vast majority of their sentence in the Travis County Correctional System spend more time than a similarly situated inmate that is "lucky enough" to spend his time in the Texas Department of Corrections.

The State Defendants indicate that actions on this lawsuit would harm the State Defendants in that they would, therefore, be in contempt of another U.S. District Court's order and the protracted litigation of Ruiz v. Lynaugh and its impending settlement and conclusion would be in jeopardy.

The harm to the County Defendants and Plaintiffs in this case outweighs any potential harm shown to State Defendants to this Court. Through review of the evidence and testimony, it is apparent that the State of Texas, since the Ruiz litigation has begun, has moved in such a way AS to comply with the orders of the District Court in that matter, but in so doing, has backlogged 10,000 or more sentenced, awaiting transfer inmates in the county jails in the State of Texas. The present population of the Texas Department of Corrections is in the neighborhood of 40,000 inmates; a large number of beds are being constructed to hold additional inmates, and evidence showed that all those beds would be on line, if construction schedules continue and voter approval is obtained, by November, 1991; but, in the interim, 10,000 more prisoners languish in the county jail systems of this state. The State Defendants have put a high price on complying with the Ruiz orders. Constitutional facilities have been provided in the Texas Department of Corrections System at the expense of the creation of potentially unconstitutional facilities in 254 counties through the backlogging of TDC sentenced inmates. The

11

threatened injuries to the County Defendants and the Plaintiff-Inmates therefore outweigh any harm to the State Defendants.

4. Whether granting of a preliminary injunction will not disserve the public interest.

The granting of the preliminary injunctions will serve the interests of the public both locally and state-wide. The equitable payment for the incarceration of inmates will result; constitutional correctional facilities will be available in Travis County for all inmates incarcerated in the county system; time served by inmates sentenced to the correctional systems will be equalized. Under the crafting of this injunction, no "substantial impact" will be felt in the Texas Department of Corrections Criminal Justice System as the State moves forward with its attempts to comply with the Ruiz v. Lynaugh orders because this Order requires that the State Defendants merely comply with a policy they, themselves, drafted.

Considering the above, this Court hereby ORDERS that a Preliminary Injunction be ISSUED requiring that the Texas Department of Criminal Justice take from Travis County a minimum of 29 inmates per week on every Friday from Friday, the 22nd of September, 1989, until the Court's Order of October 21, 1988, has been fulfilled; that sanctions of $40 per day per inmate be levied against the State Defendants in this case whenever the State fails to take their minimum of 29 per week mandatory allotment pursuant to this Court Order; that the backlog of 226 inmates not taken by the State of Texas since the Scheduled Admissions Policy was implemented in October, 1987, be taken on a systematic basis on or before April, 1990.

IV.   Bond

Pursuant to F.R.Civ.P. Rule 65(c), this Court must consider setting a bond to protect the parties against any damages resulting from wrongful injunction.   Because the plaintiffs in the case have been proceeding since 1972 through court-appointed counsel and in forma pauperis, no bond will be required of the plaintiffs'.   The County Defendants will be required to post a nominal bond of $5,000 because the State Defendants, in their evidence, indicated that only minimal damage, if any, would result if the injunction were granted. Further, the injunction, itself, is designed to insure that prior orders of this Court be met.   In that instance, a bond is not required.   See Coquina Oil Corp. v. Transwestern Pipeline Co., 825 F.2d 1461 (10th Cir. 1987); Bivens v. Board of Public Education and Orphanage for Bibb County, 284 F.Supp. 888 (M.D. GA, Macon Div. 1967); and State of Alabama v. Corps. of Engineers of the United States Army, 411 F.Supp. 126 (N.D. Ala., Jasper Div. 1976).

Any other relief set for consideration by the Court on September 11, 1989, not specifically granted is hereby DENIED.   Matters before the Court but not yet heard by the Court will be set for consideration at another time.

SIGNED and ENTERED this    18TH day of September, 1989, at Austin, Texas.


STEPHEN H. CAPELLE
UNITED STATES MAGISTRATE

13

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOSE RAUL CASTILLO, | § | |
| *et al.*, | § | |
|    Plaintifffs, | § | |
| | § | |
| V. | § | |
| | § | |
| CAMERON COUNTY, TEXAS | § | NO. B-93-260 |
|    Defendant and | § | |
|    Third-Party Plaintiff, | § | |
| V. | § | |
| | § | |
| THE STATE OF TEXAS, | § | |
|    Defendant, | § | |
| and | § | |
| ANN RICHARDS, *et al.*, | § | |
|    Third-Party Defendants | § | |
|    and Defendants. | § | |

## EXHIBIT B

### TO

### DEFENDANT THE STATE OF TEXAS' AND
### DEFENDANTS AND THIRD-PARTY DEFENDANTS
### ANN RICHARDS, ET AL.'S
### RESPONSE TO PLAINTIFFS' POST-HEARING
### BRIEF ON PRELIMINARY INJUNCTION
### AGAINST STATE DEFENDANTS

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH JUDICIAL CIRCUIT

IN RE:                              §
WILLIAM P. CLEMENTS, JR.,           §
ET AL.,                             §        NO. __89-1959__
       Petitioners and   §
       Appellants         §

## PETITION FOR A WRIT OF PROHIBITION AND MANDAMUS OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY REVERSAL IN IN RE: TRAVIS COUNTY JAIL CONDITIONS LITIGATION, NO. A-80-CA-157 (W.D. TEX., AUSTIN, DIV.)

Respectfully submitted,

JIM MATTOX
Attorney General of Texas

MARY F. KELLER
First Assistant
Attorney General

LOU McCREARY
Executive Assistant Attorney
  General for Litigation

MICHAEL P. HODGE
Assistant Attorney General
Chief, Enforcement Division

*Attorney in Charge

ROBERT OZER*
Assistant Attorney General
Chief, Class Action Section
Enforcement Division
State Bar No. 15393700

JOHN B. WORLEY
Assistant Attorney General
State Bar No. 22001480

P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2027

ATTORNEYS FOR PETITIONERS AND
APELLANTS

DATED: OCTOBER 17, 1989

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH JUDICIAL CIRCUIT

IN RE: §
WILLIAM P. CLEMENTS, JR., §
ET AL., §          NO. _89-1959_
          Petitioners and §
          Appellants §

## PETITION FOR A WRIT OF PROHIBITION AND MANDAMUS OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY REVERSAL IN IN RE: TRAVIS COUNTY JAIL CONDITIONS LITIGATION, NO. A-80-CA-157 (W.D. TEX., AUSTIN, DIV.)

NOW COME William P. Clements, Jr., James Lynaugh, Charles T. Terrell, Mamie Moore Proctor, Ben Gallant, Allan Bruce Polunsky, James Eller, F. L. "Steve" Stephens, Dennis R. Hendrix, Robert Mann, Jerry H. Hodge and the State of Texas, by and through the Attorney General of Texas, Jim Mattox, and file this their Petition for a Writ of Prohibition and Mandamus or, in the Alternative, Motion for Summary Reversal, and would respectfully show this Court the following:

I.

## STATEMENT OF THE CASE

This petition for a writ of prohibition and mandamus and/or motion for summary reversal on appeal arises from a case styled In Re: Travis County Jail Conditions Litigation, No. A-80-CA-157 (W.D. Tex., Austin Div.), one of several jail overcrowding lawsuits in Texas in which these Appellants and Petitioners (or

CibiPDF - www.tesisa.com

some of them) have been made defendants.[1]  The plaintiffs in this
case, inmates alleging unconstitutional conditions of confinement
in the Travis County jail, brought these Appellants and
Petitioners (hereinafter, "State Defendants") into the suit via a
"Second Supplemental Complaint" filed on November 30, 1988.
Exhibit 6.  This complaint seeks the removal of all convicted
felons from the Travis County jail and monetary damages from
State Defendants for allegedly subjecting these inmates to
unconstitutional conditions of confinement.

On January 12, 1989, State Defendants filed a Motion to
Dismiss and Supporting Memorandum.  Exhibit 7.  This motion and
memorandum argued (among other things) that the state prison
agency, the Texas Department of Corrections ("TDC," now the Texas
Department of Criminal Justice or "TDCJ"), could not accept all
these inmates because the consent decree in Ruiz v. Lynaugh, No.
H-78-987-CA (S.D. Tex., Houston Div.) "caps" the state prison

---

[1]See Lawrence Alberti v. The Sheriff of Harris County, No.
72-H-1094, Southern District of Texas, Houston Division (before
Judge James DeAnda) [see Exhibit 1]; Michael Allen Runyon v.
State of Texas, No. A-88-CA-971, Western District of Texas,
Austin Division (before Magistrate Stephen Capelle) [see Exhibit
2]; Devonish, et al. v. W.B. Hauck, et al., No. SA-73-CA-59,
Western District of Texas, San Antonio Division (before Judge
Lucius Bunton) [see Exhibit 3]; The County of Nueces, Texas v.
Texas Board of Corrections, et al., No. 452,071, in the 250th
Judicial District Court of Travis County, Austin, Texas [see
Exhibit 4]; and Billy Markum v. Tarrant County, Texas, et al. v.
James Lynaugh, et al., No. 348-118999-89, 348th Judicial District
Court, Tarrant County, Texas [see Exhibit 5].

- 2 -

CVАPDF - www.fastio.com

population at 95% of capacity.   See In Re: Clements, 881 F.2d 145, 147 (5th Cir. 1989).

As a result of this population cap, the TDC adopted a scheduled admissions policy, which allocated to each county a certain number of admissions each week. This scheduled admissions policy was a state administrative mechanism designed to ensure compliance with Ruiz court orders by limiting admissions into the state prison system so that the 95% limit would not be exceeded. The result of this policy was that many convicted felons with paperwork completed for transfer to the state prison could not be admitted immediately.

The Honorable Stephen H. Capelle, the United States Magistrate presiding over this case,[2] denied this Motion to Dismiss on August 16, 1989, without specifically ruling on any of the contentions asserted in it. Exhibit 8. State Defendants have filed a separate appeal from the Magistrate's decision on this Motion.

Before the Magistrate's decision on the Motion to Dismiss, the Travis County defendants in this case (the Travis County Commissioners' Court and the Travis County Sheriff) and the plaintiffs all filed motions for a preliminary injunction against the State Defendants. Exhibits 9, 10 and 11. State Defendants

---

[2]This was done by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). See Order of June 8 attached hereto as Appendix Exhibit A.

responded to those motions.  See  Exhibits 12 and 13.  On  A.
25, 1989, the Magistrate issued an order setting the motions
hearing.  Exhibit 14.  The  County defendants and the  plain-
subsequently filed amended motions.  Exhibits 15 and 16.

State Defendants  responded by  filing a  Motion to  D...
Motions  for  Preliminary  Injunction  and/or  for  a  Stay
Protective Order (hereinafter "Motion to Dismiss Motions, et
Exhibit 17.  The Magistrate  failed to  grant this  motion.
proceeded to  hold a  hearing on  the preliminary  injunctio.
September 11, 1989.[4]

On September 18, 1989, Magistrate Capelle issued a Ruli...
a  Preliminary  Injunction  Motions granting  a  preli-
injunction against the TDCJ and the State of Texas, requiri...
TDCJ to accept at least 29  inmates from Travis County each
and to accept by April, 1990, 226 inmates allegedly backlogg...

_____

[3]At a hearing  on September 7,  1989, the Magistrate
the State Defendants' request  for a Protective  Order to sto.
deposition of one state official and denied the Motion to D-
Motions for a Preliminary Injunction "at this time."

[4]In effect,  Magistrate Capelle  overruled the  Motic.
Dismiss Motions for Preliminary Injunction on September 11
when he commenced  an evidentiary  hearing on the  motions
preliminary injunction.  The gist of State Defendants' Mot.
Dismiss Motions for a Preliminary Injunction, etc. was that
Defendants should  not have  even been  "put to  trial" on
motions.  The  act of  commencing a  hearing on  the preli.
injunction was thus itself a  denial of State Defendants'
to Dismiss Motions, etc.

- 4 -

the Travis County jail because  of past TDC failures or  refusals to accept 29 inmates per week.[5]  Exhibit 18.

The  preliminary  injunction  also  imposed  on  the  State Defendants  stipulated damages of $40 per day for each inmate the TDCJ  does  not accept  as required.   The Preliminary  Injunction Order denied all other relief requested, which would include  the relief requested in State  Defendants' Motion to Dismiss  Motions for a  Preliminary Injunction, etc.  See  Ruling on  Preliminary Injunction Motions (hereinafter "Ruling") at 12-13, Exhibit 18.

The 29-per-week  figure in  the preliminary  injunction  was based on the number that the  TDC had usually accepted each  week from Travis County  under the scheduled  admissions policy.   The plaintiffs and the County defendants had argued that the TDCJ was bound to grant  each county  its usual allotment,  and the  Court seems to have accepted this argument, although not unambiguously. (See Ruling [Exhibit  18] at  8, where  the Court  speaks of  the "mandatory nature" of the allotment.)

It is very important to note that the Prison Management  Act (PMA) cannot  be  used to  control  TDCJ's population,  since  it cannot be triggered without a violation of the 95% capacity limit on the TDCJ's population.  See Jeffries Testimony (Exhibit 19) at

---

[5]State defendants  had planned  to take such  numbers  from Travis County pursuant to new construction and normal  allotment, but it is  not known,  particularly in  light of  the Alberti  v. Klevenhagen decision,  if TDCJ  will be  able to  maintain those plans. See infra at 16-18.

48-52, <u>see also</u>: Testimony of Vince Nathan, <u>Ruiz</u> Special Master, in <u>Alberti v. Klevanhagen</u>, No. H-72-1094 (S.D. Tex., Houston Div.), (Exhibit 20).[6] Nor does TDCJ control either the number of days of good time awarded or whether an inmate will be granted parole. Moreover, while the PMA awards are being processed and parole determinations[7] made, continued intake would drive TDCJ even further above court ordered caps. Accordingly, TDCJ must close every time the PMA is triggered by TDCJ population exceeding 95% of capacity. <u>Id</u>. Moreover, the State Defendants have in state court challenged the constitutionality of the PMA on State law grounds and for this reason requested the lower court here to abstain in this case. Exhibits 21 and 22. Travis County has intervened as a party to that suit. Exhibit 23.

On September 20, 1989, State Defendants filed a notice of appeal (Exhibit 24) from the Court's Order of September 18, 1989. They request that this motion for summary reversal on appeal be considered in conjunction with the petition for a writ of prohibition and mandamus made herein.

---

[6]Mr. Nathan's testimony was attached to a Request for a Stay in the Court below.

[7]Parole determinations, of course, normally take several weeks to process.

- 6 -

II.

## REASONS FOR A WRIT OF PROHIBITION AND
## MANDAMUS OR FOR SUMMARY REVERSAL

A.   THE INJUNCTION IS  CONTRARY TO THIS  COURT'S DECISION IN  IN RE: CLEMENTS.

The lower court's decision on this preliminary injunction is contrary to this Court of Appeal's decision in In Re:  Clements, 881 F.2d 145 (5th Cir. 1989), in a number of ways.

1.   The Lower Court Failed to Make the Findings Required by Clements.

First, the Court of Appeals' opinion in Clements indicated that when Texas state prison officials are brought into a federal suit concerning the constitutionality of a county jail, the court must first decide the present constitutionality of the jail in a proceeding in which the  state officials are parties.   Clements, 881 F.2d 154; Accord see Carver  v. Knox County v. McWherter, __ F.2d __, Nos.  89-5341 and 89-2369  (6th Cir., October 6,  1989), Exhibit 25 (slip  opinion at  15).   Magistrate Capelle made  no findings concerning the  present constitutionality of the  jail, not even a finding on  whether the proponents of the  preliminary injunction would  likely  succeed  on that  issue.   Indeed,  the Magistrate specifically refused  to decide the  constitutionality issue, (see Ruling on Preliminary  Injunction Motions at 5-8)  or decide whether the proponents would likely prevail on the  issue. See Ruling on  Preliminary Injunction Motions  (Exhibit 18) at  7 ("The merits of this case do not include the constitutionality of the conditions in the Travis County Jail").

In order to issue a preliminary injunction, the Court must find that the proponents will likely prevail on the merits of the main case. Under In Re: Clements, the merits of this case certainly do include the present constitutionality of the Travis County Jail.

It should be noted here that the Court of Appeals in Clements was well-justified in its conclusion that the constitutionality of the jail in issue would have to be determined anew in a proceeding in which the state officials were parties. The state officials in the Harris County jail case, just as state officials here, were strangers to the decrees which found the Harris County Jail unconstitutional. These decrees thus would not be binding on them. See Martin v. Wilkes, 57 U.S.L.W. 4616 (June 13, 1989).

This reasoning is particularly compelling in as much as the underlying compliance issue in the lower court rested on state, not federal law.

In that regard Magistrate Philip Sanders in his Findings, Recommendations and Order filed October 30, 1981 ruled that the old jail was "not to be inhabited without renovation and compliance with the Texas Commission on Jail Standards' requirements for county facilities." Exhibit 26 at 12; See also Ruling on Preliminary Injunction Motions (Exhibit 18) at 3. In an Agreed Order entered on September 9, 1987, Travis County

- 8 -

consented[8] to comply with Magistrate Sanders' October 30,
Order "until the old jail is either brought into compliance
minimum jail standards without variances or until inmates are
longer occupying said facility." Exhibit 27 at 2. In Fir
and Order issued in October, 1988, Magistrate Capelle ruled
Travis County, because of cost considerations, did not inten
bring the old Travis County Jail into compliance with
Commission On Jail Standards' requirements. Exhibit 28 at 4.
Accordingly, he ordered that the old jail be closed by De     r
1, 1990.[9] Id. at 10.

In its Ruling on Motions for Preliminary Injunction
lower court made clear that it was compliance by Travis
with this order, "not whether the jail is unconstitution      "
which was the issue before the court. Ruling (Exhibit 8) at

> Thus the current issue at the preliminary
> injunction is not whether those improved
> conditions [in the old jail] are
> constitutional or not. The issue is whether
> Travis County has complied with and will be
> able to comply with the specified orders and
> remedial requirements of the Court.

Id.

---

[8]The fact that Travis County chose to be governed by
law in federal court does not, of course, bind TDCJ. See
Number 93 v. City of Cleveland, 478 U.S. 501, 529 (1986) (Con
decree does not impose duties on third parties).

[9]Only TDC ready inmates were to be placed in the old
Id. at 9.

- 9 -

2.  The Lower Court Failed to Transfer the Remedy Question to the Ruiz Court.

Finally, the ruling of the lower court is in violation of Clements in that it "directly and substantially affects happenings with the Texas prison system." Clements, 881 F.2d at 154. The Court of Appeals in Clements granted the petition for a writ of mandamus precisely "to avoid having a non-Ruiz court entertain the issuance of a decree with that effect." Accord see Carver v. Knox County v. McWherther supra, Exhibit 25.[12]

    a.  The Lower Court's Order in Itself Directly and Substantially Affects the TDCJ.

Magistrate Capelle's order does directly and substantially affect happenings within the State prison system. It would require the TDCJ to accept 29 prisoners from Travis County weekly, as well as the 226 prisoners previously not taken in accordance with the 29-per-week allotment even if that would mean that the State prison system population would exceed 95% of capacity in violation of the Ruiz decree. Moreover, the number of inmates involved here is large enough to constitute "a direct and substantial effect." The Sixth Circuit found that a District

---

[12]The Sixth Circuit has exercised continuing supervision over county jail litigation in Tennessee with a view to avoiding the potential conflicts that may arise from piecemeal decision-making. See Exhibits 30-31 (orders entered by the Sixth Circuit in Roberts v. Tennessee Department of Corrections, No. 89-5307 and Carver v. Knox County, Tennessee v. McWherther, Nos. 89-5341 and 89-5369.

However, it is perfectly clear in this Circuit that the lower court lacked jurisdiction to enforce compliance with state law, such as Texas Commission on Jail Standards requirements, by court order. See Lelz v. Kavanaugh, 802 F.2d 1243, 1252-53 (5th Cir. 1987), reh. denied, 815 F.2d 1034, cert. denied, ___ U.S. ___, 108 S.Ct. 44; See also Pennhurst State School v. Halderman, 465 U.S. 89, 106 ("[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law."); cf. Bush v. Viterna, 795 F.2d 1203 (5th Cir. 1986). In effect then, the lower court improperly ordered TDCJ to take inmates out of the Travis County jail in order for the jail to comply with state law jail standards. To the extent it did, it erred. See Lelz, supra; Pennhurst, supra.

Furthermore, by failing to decide whether the proponents would likely prevail on the issue of the constitutionality of the jail, the Court has failed to make a finding necessary for a preliminary injunction. Without that finding, the issuance of the injunction was error.

Moreover, there is no way, given the present record, that the Court could have found that the proponents would likely succeed on this point. The only evidence presented at the preliminary injunction hearing on the current status of the jail

was that it now meets constitutional standards.  <u>See</u> excerpt from Testimony of Steve Martin, Exhibit 29.[10]

Magistrate Capelle justified the order not with findings on the proponents' likelihood of success on the merits of the main case, but with a finding that "in all likelihood the movants of this preliminary injunction would prevail on the issue of whether the actions of the State interfere with the Court's orders." Ruling (Exhibit 18) at 8. However, those orders sought to enforce state law.  The Court thus did not pass on the proper question of the constitutionality of the jail in deciding to issue the injunction.  Its decision was thus clearly ill-founded and erroneous.  <u>See</u> Testimony of Steve Martin, Exhibit 29 at 194.

Similarly, the Court made no finding concerning the proponents' likelihood of success in proving the responsibility of the State Defendants for the alleged unconstitutional conditions in the Travis County Jail.[11]  This failure also contravenes the instruction of this Court in <u>Clements</u>.  <u>Clements</u>, 881 F.2d at 154-55.

_____

[10]Ironically TDC is, under <u>Ruiz</u> standards, more dense than the Travis County jail. <u>Id</u>. at 190-191.

[11]The lower court explicitly declined to rule on the "legal duty of the State Defendants."  Ruling (Exhibit 18) at 7.  It even declined to decide whether the issue of the State Defendants' legal duty would be "an appropriate matter for this federal court to rule upon, raising the possibility that it might even abstain on this issue."  The lower court clearly has misunderstood its responsibilities under <u>Clements</u>.

Court order involving only 100 inmates over a three month period had a direct and substantial effect on the state prison system when it ordered a stay of that order in <u>Tennessee Department of Corrections v. Roberts</u>, No. 89-5307, (6th Cir., March 16, 1989). <u>See</u> slip op. at 2 (attached hereto as Exhibit 32)[13]; <u>see also</u> <u>Carver v. Knox County v. McWherther</u>, <u>supra</u>, Exhibit 25. The Court appropriately noted the possibility of conflicting orders in other District Courts and concluded that: "[W]e should not have five or six different federal district judges ordering the state prison system to do potentially conflicting acts when we have one main prison case pending . . . [W]e need to have one cook in the kitchen, not several with conflicting remedies . . ." Slip op. (Exhibit 32) at 5.

Moreover, the lower court's order would force the TDCJ to alter its basic policies concerning admissions. The Court's Ruling states that "[u]nder the crafting of this injunction no 'substantial impact' will be felt in the Texas Department of Corrections Criminal Justice System as the State moves forward to comply with the <u>Ruiz v. Lynaugh</u> orders because this Order requires that the State Defendants merely comply with a policy that they, themselves, drafted." Ruling (Exhibit 18) at 12.

---

[13]The order required the State prison system to accept 100 inmates over a three-month period.

- 13 -

However, the Scheduled Admissions Policy must be viewed in conjunction with the TDCJ's policy to close when the system exceeds 95% of capacity and to close on holidays (reducing each county's allotment during the week of the holiday). Excerpt from Testimony of Melissa Caldwell, Exhibit 33, at 17-18[14]; Jeffries, Exhibit 19, at 32, 36. Those two policies qualify the Scheduled Admissions Policy, and, with the Scheduled Admissions Policy, are substantial components of the TDCJ's overall policy on admissions. The Court's order negates those two components of the TDCJ's overall admissions policy when it comes to admissions from Travis County and raises Ruiz compliance issues. The TDCJ would have to accept Travis County's full allotment during weeks in which there were holidays and even accept Travis County prisoners after the system had exceeded 95% of capacity, despite the violation of Ruiz orders.

> b. The Lower Court's Order, Combined with Similar Orders, Would Directly and Substantially Affect the TDCJ.

More importantly, though, the Court's order raises the possibility of similar orders in similar cases which together would have the cumulative effect of interfering with the Ruiz

---

[14]The result of closing on holidays is not that a county loses its weekly allotment entirely. Instead, counties' weekly allotments for the week of the holiday are reduced. Exhibit 33 at 16-18.

- 14 -

decree.  The  TDCJ  is  currently  involved  in  federal  litigation
concerning the constitutionality of conditions of confinement not
only in the  Travis County Jail  but in the  Harris, Dallas,  and
Bexar County Jails  as well.[15]   See Exhibits  1, 2,  and 3  (the
pleadings bringing State Defendants into the Harris, Dallas,  and
Bexar County federal lawsuits).  See  also Clements, 881 F.2d  at
150 n.10.  If orders  similar to the order  entered by the  lower
court in the Travis County litigation were issued in these  other
cases, their cumulative effect on the TDCJ would without doubt be
"direct and substantial."

Dallas County,  for  instance,  is  allotted  125  prisoners
weekly, spread over  two days of  admission. (Jeffries [Exhibit
19] at  13-14).  TDCJ  intake has  been closed  to Dallas  County
prisoners ten  times. (Jeffries  [Exhibit 19]  at 14).   Assuming
that each weekly presentation of  125 prisoners is split  equally
between the two days, TDCJ has  not accepted at least 620  Dallas
County inmates on account of closings.  Bexar County has a weekly

---

[15]There are  also  state  court  actions ‥pending  in  which
various Texas counties are  seeking to force  the TDCJ to  accept
allegedly  backlogged  convicted  felons,  including  a  suit  in
Tarrant County and one  involving Nueces County  and a number  of
other counties.  (Jeffries [Exhibit 19] at 59.  See Exhibits 4-5)
The plaintiff in the Tarrant County suit alleged overcrowding  in
the Tarrant County jail.   Tarrant County Commissioners Court  v.
Markham, No. 2-89-097-CV (Tex.  Civ. App.--Fort Worth,  September
28, 1989, no writ), slip op. at 2.

CIMPDF - www.fenix.com

allotment of 28 prisoners.   (Exhibit 34)[16].  Since Bexar County delivers its prisoners to the TDCJ on Friday like Travis County (see Exhibit 35)[17], the TDCJ has been unable to accept the Bexar County weekly allotment six times.   Thus, the plaintiffs and County Defendants in Bexar County could demand that the TDCJ "make up" for at least 168 inmates not taken on those occasions. The total number of inmates from Dallas and Bexar counties not taken because of closings thus appears to be something in the neighborhood of 788.   Added to the 226 from Travis County the lower court required the TDCJ to "make up", there appear to be about 1,000 extra inmates from these three counties alone that TDCJ could be forced to accept regardless of the effects that might have on the maintenance of the Scheduled Admissions Policy or on compliance with Ruiz orders.  This leaves aside consideration of other counties such as Tarrant, in which federal lawsuits concerning overcrowding conceivably could be filed and similar orders entered.

In this regard, Tarrant County's weekly allotment is 51. (Exhibit 34).   The TDCJ has been unable to accept Tarrant County's allotment four times.   Jeffries [Exhibit 19] at 16. Thus, as of the date of the hearing in this case, inmates and

---

[16]Admitted into evidence at the Preliminary Injunction hearing as State Defendants' Exhibit 8.

[17]Admitted into evidence at the Preliminary Injunction hearing at County Defendants' Exhibit 7.

- 16 -

county officials in Tarrant County could claim that TDCJ needed to make up for 204 inmates not taken. Indeed, because TDCJ accepts 150 inmates each weekday, and because the TDCJ intake has been required to close on 24 days since institution of the Scheduled Admissions Policy, the state prison system's alleged "debt" to all Texas counties stood at approximately 3,600 (at least) at the time of the hearing.[18] (Jeffries [Exhibit 19] at 39). The Court's Ruling (Exhibit 18) itself acknowledges the possibility of litigation over the constitutionality of jails throughout Texas when it speaks of "the creation of potentially unconstitutional facilities in 254 counties through the backlogging of TDCJ sentenced inmates." Ruling (Exhibit 18) at 11. Yet the Court did not seem to recognize that the iteration of its order in many of these counties would surely have a significant impact on the TDCJ and that its order thus fell within the ambit of Clements.

The lower court's order thus ignores the potential cumulative effect that orders similar to it could have on the TDCJ. The thrust of Clements was to avoid a myopic focus on local conditions that, repeated cumulatively in various parts of the State, could jeopardize the TDCJ's compliance with Ruiz

_____

[18]This does not count admission reductions during holiday weeks.

orders.   The   lower   court's   order   consequently   ignores   the
guidance of <u>Clements</u>.

     c.    Compliance With  the Lower  Court's Order  Could  Force
          TDCJ to Choose Between Complying with <u>Ruiz</u> Court Orders
          and   Orders    That   May   be   Issued   in  <u>Alberti   v.</u>
          <u>Klevenhagen</u>.

Finally, there  is  the  possibility  that  Travis  County's
weekly allotment might have  to be reduced  in  order to effect  a
disposition of  the <u>Alberti</u>  litigation  in Harris  County.   The
federal district court presiding over <u>Alberti v. Klevenhagen</u>, No.
H-72-1094 (S.D. Tex., Houston Div.)  has found the conditions  in
the Harris County Jail to  be unconstitutional and has found  the
Governor, the members of the Texas Board of Criminal Justice, and
the Director of the TDCJ to  be partly liable for this  unconsti-
tutionality.  <u>See</u> Exhibit  36.  (Order of  September 25, 1989  in
<u>Alberti v. Klevenhagen</u>).  The <u>Alberti</u> court also ordered transfer
of the remedy portion of that  case to the District Court in  the
<u>Ruiz</u> case.  Given the horrendous conditions in the Harris  County
Jail, acknowledged by all parties  in the <u>Alberti</u> lawsuit, it  is
quite possible that TDCJ will be ordered to accept large  numbers
of prisoners from that jail almost immediately.  If so, the  TDCJ
would have to reduce  its allotments from  other counties in  the
State.  (<u>See</u>  Jeffries  [Exhibit  19]  at  59).  If  the  number
accepted from Harris  County were large  enough, that might  even
mean that TDCJ would be able  to accept inmates only from  Harris
County for  some  period of  time  to avoid  exceeding  the  <u>Ruiz</u>
court's 95% capacity limit.

This is why it is crucial for the _Ruiz_ court to have consolidated control of injunctive relief affecting the TDCJ's intake. Without such consolidation, the TDCJ faces the specter of conflicting orders. Thus, Magistrate Capelle at the very most should only have considered whether the proponents of the injunction had shown themselves entitled to some relief. He should have then transferred the matter to the _Ruiz_ court for formulation of the exact relief to be granted.

B. THE COURT'S REMEDY IS BARRED BY THE ELEVENTH AMENDMENT

For a variety of reasons the remedy of the Court is barred under Eleventh Amendment immunity.

1. Lower Court Lacked Jurisdiction to Force TDCJ to comply with State Law[19]

The motions for a preliminary injunction called upon the Court to compel the TDCJ to observe an alleged state-law duty to accept at least 29 convicted felons from Travis county each week and to make up for the times in the past that it had accepted less than 29. The injunction granted this requested relief, thus enforcing an alleged state-law duty against State Defendants. Under _Pennhurst State School & Hospital v. Halderman_, 465 U.S. 89 (1984), the federal district court had no jurisdiction to enforce an alleged state-law duty against State Defendants particularly

---

[19]_See also infra_ at 8-10, concerning state law basis of Travis County court orders.

- 19 -

where there had been no finding of unconstitutionality as required by <u>Clements</u>.[20]

This is especially the case when state law may be adjusted in order to remedy unconstitutional conditions found by the <u>Alberti</u> court in the Harris County jail. Moreover, the scheduled admissions formula may be modified and Travis County's allotment reduced when an allocation formula pursuant to H.B. 2335 is devised. TDCJ has vast discretion in formulating an allocation formula to Section 3.06 of HB 2335. <u>See</u> <u>Clements</u>, 881 F.2d at 151 n.12.

2. The Lower Court Lacked Jurisdiction to Award Stipulated Damages Against State Defendants

The Second Supplemental Motion of Sheriff of Travis County and Travis County Commissioners Court for Preliminary Injunction (Exhibit 15) at 4 stated that "[u]ntil such time as the Texas Department of Corrections accepts the 226 prisoners who should

---

[20] The injunction is also technically flawed from an Eleventh Amendment standpoint. It requires action of the Texas Department of Criminal Justice <u>eo nomine</u>. Ruling (Exhibit 18) at 12. It subjects all the State Defendants to sanctions of $40 a day "whenever the State fails to take their minimum of 29 per week mandatory allotment pursuant to this Court Order . . ." <u>Id</u>. The State of Texas continues to be one of the State Defendants, since the Court erroneously denied the State Defendants' Motion to Dismiss, in which they asserted the State's Eleventh Amendment immunity. Because the TDCJ and the State of Texas are absolutely immune from suit, they may not be the subjects of such relief. <u>Ruiz v. Estelle</u>, 679 F.2d 1115, 1137 (5th Cir. 1982). These defects in the Court's order may be technical, but they are nonetheless fatal. <u>See</u> <u>Loya v. Texas Department of Corrections</u>, ___ F.2d ___, No. 88-6145 (5th Cir., August 2, 1989).

have already been transferred, the State Defendants should be ordered to pay monetary sanctions to Travis County at the rate of $40 per day per inmate." In its request for relief, Travis County prayed (at 5) that "as sanctions the Texas Department of Corrections be ordered to reimburse Travis County at the rate of $40.00 per day per inmate for each inmate it has refused to accept or in the future refuses to accept under its Scheduled Admissions Policy." Coupled with its allegations of economic harm, see Second Supplemental Motion (Exhibit 15) at 2-3, it was apparent that Travis County, under the guise of "sanctions", was seeking monetary damages from the State of Texas.[21]

Given the state of the pleadings calling for a preliminary injunction, it is clear that Travis County sought stipulated damages should State Defendants fail to comply with the Court's Order. However, damages or retrospective injunctive relief which

---

[21]Moreover, the County's assertion of equitable claims of economic harm, which are based neither on the United States Constitution nor on federal statute, is forbidden under Pennhurst. See Bush v. Viterna, 795 F.2d 1203, 1208-09 (5th Cir. 1986) (the federal civil rights statute may not be used as a "bootstrap" to obtain the litigation of non-federal claims in federal court). Just as the District Court could not decide on Travis County's non-federal claims concerning economic harm in the main case, it could not properly consider claims of that kind in deciding on the issuance of a temporary injunction. To allow non-federal claims to be raised in justification of a temporary injunction is to allow clever litigants the use of the temporary injunction as a means to evade Pennhurst--at least temporarily. The District Court thus erred in considering those claims at all. It should have given them no weight, but, instead, it is clear that they weighed heavily in its decision.

would have an impact on the  State Treasury are barred under  the Eleventh Amendment.  <u>Cory v. White</u>,  457 U.S. 85 (1982); <u>Edelman v. Jordan</u>, 415 U.S. 651 (1974).

In the instant case, assuming the lower court had  authority and jurisdiction under <u>Clements</u> and <u>Pennhurst</u> to  obtain  an injunction  the  lower  court  lacked  jurisdiction  to  award stipulated damages against State  Defendants.  Rather, the  Court should have issued an order enjoining State Defendants to  accept a certain number of inmates per week.  If State Defendants failed to accept those  inmates, then Travis  County could have  brought contempt proceedings, at  which time state  officials could  have raised such defenses  such as  impossibility at  a full  hearing. The lower court's short hand rendition of traditional proceedings in obtaining  and enforcing  federal injunctive  orders makes  it clear  that  these   "prospective  sanctions"   are  in   reality stipulated  damages.   In addition,  shortcutting  the  contempt process runs afoul of not only the Eleventh Amendment but the Due Process Clause of the Fifth Amendment as well.

  3. Under Eleventh  Amendment  County Had  No  Standing  to
    Assert Claims of Economic Harm Against the State

The above arguments  are particularly  compelling given  the fact that Travis County  and its officials  lack standing to  sue the state in federal court.

Under fundamental  state law  Travis  County is  a  creature solely of the state.  See TEX. CONST. art. IX, § 1 (counties  are created by the Legislature "for the convenience of the  people").

In the instant case, especially when the lower court made no finding of any constitutional violation of the rights of inmate class, the County Defendants had no standing to assert the alleged economic harm of "increased taxes" or "a readjustment of where taxes must be spent." Travis County lacks standing to assert through its officials such claims against its creator, the State of Texas, in this federal lawsuit. See Town of Ball v. Rapides Parish Police Jury, 746 F.2d 1049, 1049, 1051 n.1 (5th Cir. 1984); Appling County v. Municipal Electric Authority, 621 F.2d 1301, 1307-1308 (5th Cir. 1980), cert. denied, 449 U.S. 1015 (1980).[22]

---

[22] Nor can inmates confined in the Travis County Jail derive any federal right to "rehabilitative services" by virtue of the Ruiz decree, as the Court seems to suggest in its Ruling (Exhibit 18) at 9-10. Convicted felons in the Travis County Jail are not members of the Ruiz plaintiff class. That class consists of "inmates confined in the various institutions operated by the . . . TDC." Ruiz v. Estelle, 679 F.2d 1115, 1126 (5th Cir. 1982).

Inmates in the Travis County jail are entitled to constitutional conditions, which they are indisputably receiving. They are not entitled to the benefits of the Ruiz court decrees. In that light, very recently, the Fifth Circuit has ruled the remedies created by the Ruiz consent decrees do not create constitutional entitlements but are merely the means of enforcing constitutional violations. "[R]emedial decrees are the means by which unconstitutional conditions are corrected but they do not create or enlage constitutional rights. . . . We conclude . . . that a remedial court order standing alone does not serve as the basis for § 1983 liability." Green v. McKaskle 788 F.2d 1116, 1123 (5th Cir. 1986); see also Lelsz v. Kavanaugh, 807 F.2d 1243 (5th Cir. 1987), reh. denied, 815 F.2d 1034, cert. denied, _____ U.S. _____, 108 S.Ct. 44 (1987)(Consent decrees can only be enforced with reference to the constitutional rights they are designed to ensure); Local Number 93 v. City of Cleveland, _____

(Footnote Continued)

C.   LOWER COURT SHOULD HAVE ABSTAINED

  1.   Abstention Was Required On the Issue of Liability

Particularly in light of its failure to find the conditions of confinement in the Travis County Jail unconstitutional, the lower court should have abstained. In fact, the lower court noted: "The legal duty of the State Defendants is presently being litigated in state court in the Nueces County litigation and may, or may not be, an appropriate matter for this federal court to rule upon." Under well settled principles of abstention, the lower court should have abstained to allow state courts to construe state law. See Railroad Commission of Texas v. Pullman, 312 U.S. 496 (1941), see also, Bush v. Viterna, 795 F.2d at 1205 n.1. That fact that a state court action was pending in which Travis County had intervened (see Exhibit 23), only reenforces this conclusion. See generally, Younger v. Harris, 401 U.S. 37 (1971); Middlesex County Ethics Committee v. Garden State Bar Association, 457 U.S. 423 (1982).[23] This is

_____

(Footnote Continued)
U.S. _____, 106 S.Ct. 3063, 3077 (1986)("[A] consent decree must spring from and serve to resolve a dispute within the court's subject-matter jurisdiction"). In short, Ruiz provided remedies for unconstitutional conditions at TDCJ; it did not provide correctional standards for the operation of county jails. See Ruiz v. Estelle, 679 F.2d 1115, 1145 (5th Cir. 1982)("Our remedial powers are inherently judicial, not administrative"). The plaintiffs inmates thus have shown no injury whatsoever that is cognizable in federal court under Pennhurst.

[23]Moreover, the granting of the relief requested against state officials herein will impact on and interfere with state
(Footnote Continued)

especially the case here where the <u>Clements</u> court indicated that the lower court must decide the issue of liability with reference to state law. <u>See Clements</u>, 881 F.2d at 154-55; see also <u>infra</u> at 11.

Moreover, the lower federal court has frozen the number of allotments for Travis County when it should have abstained to state officials presiding over a complex regulatory scheme designed to formulate an allocation as mandated by H.B. 2335. See <u>Burford v. Sun Oil Co.</u>, 319 U.S. 315 (1943). Review of that allocation formula could have proceeded through the state court system pursuant to Administrative Procedure and Texas Register Act, TEX. REV. CIV. STAT. ANN. art. 6252-13a §§ 12, 19 (Vernon Supp. 1989).[24]

---

(Footnote Continued)
court proceedings seeking to resolve the very issues before the lower court, including the legality under state law of the scheduled admissions policy. When any relief obtained by plaintiffs herein is "inextricably intertwined" with the state court's grant or denial of relief, plaintiffs "may not obtain review of state court action by filing complaints about those actions cast in the form of civil rights suits." <u>Hale v. Harney</u>, 786 F.2d 688, 690-691 (5th Cir. 1986); <u>see also District of Columbia Court of Appeals v. Feldman</u>, 460 U.S 462, 482 (1983); <u>Rooker v. Fidelity Trust Co.</u>, 263 U.S. 413, 416 (1923).

[24]Moreover, the Supreme Court has only recently justified abstention pursuant to Art. I, § 13 of the Texas Constitution, the "open courts" provision. <u>See Pennzoil Co. v. Texaco, Inc.</u>, __ U.S. __, 107 S.Ct. 1519, 1526, 1528 (1987).

2.    Lower Court Should Have Abstained On Award of
      Stipulated Damages

Similarly, under Pullman and Younger the lower court  should
have abstained on the issue of the stipulated damages awarded  to
Travis County.   In that regard, Travis County had filed a lawsuit
styled Travis County v.  the State of Texas,  No. 458,721 in  the
353rd Judicial District Court of Travis County.  Exhibit 37.    In
that suit, Travis County is seeking monetary compensation for the
incarceration of  convicted felons  in  the Travis  County  Jail.
Given the pendency of  that action, the  lower court should  have
abstained  from    awarding   stipulated  damages   should   state
defendants have  failed to  comply with court  orders.   Rather,
assuming it had  jurisdiction to  act at all  under Clements  and
Pennhurst, the Court should  have considered imposition of  fines
only after a hearing pursuant to a contempt application.

### III.

### CONCLUSION

Traditionally, federal  courts  have  been  the  shield  for
protecting  the  constitutional   interests  of   the  poor   and
disenfranchised.  See United States v. Carolene Products Co., 304
U.S. 144, 152 n.4.  And one  member of this Court has  eloquently
written  of  the  importance  of  protecting  the  constitutional
interests of those incarcerated for crimes.

> Though we may  be dealing here  with some  of
> the most incorrigible members of our  society
> (although  not   solely),   how  we   treat   these
> particular individuals determines, to a large
> extent, the moral fibre  of our society as  a
> whole and if we trespass beyond the bounds of

- 26 -

> decency, such excesses become an affront to
> the sensibility of each of us.

See Novak v. Beto, 453 F.2d 661, 671 (5th Cir. 1971) (Tuttle, J., concurring in part and dissenting in part). See also Ruiz v. Estelle, 503 F.Supp. 1265 (U.S.D.C. S.D. Tex.), aff'd in part and rev'd in part, 679 F.2d 1115 (1982), cert. denied, 460 U.S. 1042 (1983).

In the instant case, aside from the problems outlined above, the lower court has inverted the traditional role of federal courts to serve the local interests of Travis County. In that regard, the lower court has, in a case of potential conflict with remedial orders directed at resolving the constitutional interests of inmates languishing in the horrendous conditions of the Harris County Jail, given priority to the taxpayers of Travis County. For the reasons stated above, this inversion of the traditional role of federal courts cannot stand and the lower court's ruling merely highlights the need for consolidated proceedings by the Ruiz court as to TDCJ intake.

IV.

### REQUEST FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, State Defendants request that this Court of Appeals grant a writ of prohibition forbidding the enforcement of the September 18, 1989 ruling by the lower court, and/or, as additional or alternative relief, grant a further writ of prohibition and mandamus forbidding Magistrate Capelle from entering any future order affecting the TDCJ's

- 27 -

CHzPDF - www.fastio.com

intake procedures and requiring the Magistrate to transfer to the Ruiz court the consideration of any requested relief that would affect the TDCJ's intake procedures, and/or, in the alternative, summarily reverse the lower court's ruling of September 18, 1989, in this cause and dismiss the injunction and for such other relief this Court may deem just, fair and equitable.

Respectfully submitted,

JIM MATTOX
Attorney General of Texas

MARY F. KELLER
First Assistant
  Attorney General

LOU McCREARY
Executive Assistant Attorney
  General for Litigation

MICHAEL P. HODGE
Assistant Attorney General
Chief, Enforcement Division


JOHN B. WORLEY
Assistant Attorney General
State Bar No. 22001480


\*Attorney in Charge          ROBERT OZER\*
Assistant Attorney General
Chief, Class Action Section
Enforcement Division
State Bar No. 15393700

P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2027

**ATTORNEYS   FOR   PETITIONERS   AND
APELLANTS**

[14/tc1]

CM/PDF - www.fastio.com

## CERTIFICATE OF SERVICE

I do hereby certify that a copy of State Defendants' Petition for a Writ of Prohibition and Mandamus or, In The Alternative, Motion for Summary Reversal in In Re: Travis County Jail Conditions Litigation, No. A-80-CA-157 (W.D. Tex., Austin Div.) will be served by hand delivery on the 18th day of October, 1989, to the following:

**Opposing Counsel, Court Liaison Officer and Presiding Judge in In Re: Travis County Jail Conditions Litigation, No. A-80-CA-157, Western District of Texas, Austin Division**

**BOBBY TAYLOR**
Attorney at Law
1709 E. M.L.K. Blvd.
Austin, Texas 78702
(512) 476-4886

**MARTHA DICKIE**
MINTON & BURTON
1100 Guadalupe
Austin, Texas  78701
(512) 476-4873

**CHARLES CRAIG**
Court Liaison Officer
1210 Nueces
Austin, Texas  78701
(512) 477-7785

**J. PATRICK HAZEL**
**EDWARD SHERMAN**
727 East 26th Street
Austin, Texas 78705
(512) 477-1158

**MARGO FRASIER**
Attorney at Law
1400 One Congress Plaza
111 Congress Avenue
Austin, Texas 78701
(512) 479-9765

**KEN ODEN**
Travis County Attorney
314 W. 11th Street
Austin, Texas  78701
(512) 473-9415

**HONORABLE STEPHEN CAPELLE**
U.S. Magistrate
Western District of Texas
U.S. Courthouse, Room 405
200 West 8th Street
Austin, Texas  78701
(512) 482-5679

ROBERT OZER
Assistant Attorney General
State Bar No. 15393700
S.D. No. 1424

14/tcl.jw]

- 30 -

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOSE RAUL CASTILLO, | § | |
| *et al.*, | § | |
|        Plaintifffs, | § | |
| | § | |
| V. | § | |
| | § | |
| CAMERON COUNTY, TEXAS | § | NO. B-93-260 |
|        Defendant and | § | |
|        Third-Party Plaintiff, | § | |
| V. | § | |
| | § | |
| THE STATE OF TEXAS, | § | |
|        Defendant, | § | |
| and | § | |
| ANN RICHARDS, *et al.*, | § | |
|        Third-Party Defendants | § | |
|        and Defendants. | § | |

## EXHIBIT C

## TO

## DEFENDANT THE STATE OF TEXAS' AND
## DEFENDANTS AND THIRD-PARTY DEFENDANTS
## ANN RICHARDS, ET AL.'S
## RESPONSE TO PLAINTIFFS' POST-HEARING
## BRIEF ON PRELIMINARY INJUNCTION
## AGAINST STATE DEFENDANTS

P.03

U.S. COURT OF APPEALS
FILED
OCT 23 1989
GILBERT E. GANUCHEAU
CLERK

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

### No. 89-1923

IN RE:  TRAVIS COUNTY JAIL CONDITIONS LITIGATION

CLASS OF INMATES, TEXAS DEPARTMENT OF CORRECTION,

Plaintiffs-Appellees,

versus

BRUCE TODD, COUNTY COMMISSIONER, ET AL.,

Defendants-Appellees,

versus

WILLIAM CLEMENTS, Governor of Texas, ET. Al.,

Defendants-Appellants.

---

## Appeal from the United States District Court
### for the Western District of Texas

---

\* \* \* \* \* \* \* \*



IN RE:  WILLIAM P. CLEMENTS, JR., ET AL.,

Petitioners.

---

## Petition for Writ of Prohibition and Mandamus to the
### United States District Court for the
### Western District of Texas