UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
ENTERED

SEP 15 1994

Michael N. Milby, Clerk
By Deputy: _____

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

United States District C—
Southern District of T—
FILED

SEP 14 1994

Michael N. Milby, C—

| | | |
|---|---|---|
| JOSE RAUL CASTILLO, ET AL. | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-93-260 |
| | § | |
| CAMERON COUNTY, TEXAS, ET AL. | § | |

## MEMORANDUM DECISION AND ORDER

The certified Plaintiff class of present and future detainees in Cameron County, Texas (Plaintiffs) applied for preliminary injunctive relief from unconstitutional jail overcrowding against Defendant Cameron County, Texas (County Defendant) and various Texas officials and Texas itself (State Defendants). The parties briefed the preliminary injunction issues for this Court both before and after this Court heard three days' evidence on Plaintiffs' application and conducted an announced tour of the facilities at issue. By the analysis below, this Court finds that preliminary injunctive relief is immediately warranted against both the County and State Defendants, though not in the form proposed by Plaintiffs.

### I. PLAINTIFFS' BURDEN

A preliminary injunction may be granted only if the moving party proves '(1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is not issued; (3) that [the] threatened injury to the movant outweighs any damage the injunction may do to the opponent; and (4) that the injunction will not disserve the public interest.' The preliminary injunction is an extraordinary remedy, however, and the movant must clearly carry the burden of persuasion on each factor.

*United Offshore Co. v. Southern Deepwater Pipeline*, 899 F.2d 405, 407-08 (5th Cir. 1990)

(citations omitted).

A. Success on the Merits

1. Requisite Standards of Confinement

By their First Amended Petition, Plaintiffs allege that both the County and State Defendants have deprived them of their Fourteenth Amendment rights by holding them in overcrowded facilities; they seek injunctive relief from these violations under 42 U.S.C. § 1983.

The Plaintiff class consists of both pre-trial detainees and convicted inmates held by Cameron County officials. The Fourteenth Amendment, incorporating Fifth Amendment Due Process standards for pre-trial detainees and Eighth Amendment Cruel and Unusual Punishment standards for convicted inmates, guarantees these sub-classes different conditions of confinement. Pre-trial detainees may not be subjected to punishment. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Overcrowding becomes punishment when it "subjects a detainee over an extended period to genuine privations and hardship not reasonably related to a legitimate governmental objective." *Lareau v. Manson*, 651 F.2d 96, 103 (2d Cir. 1981). Whether overcrowding inflicts punishment on pre-trial detainees depends on the totality of the circumstances in the jail. *Jones v. Diamond*, 636 F.2d 1364, 1374 (5th Cir.), *cert. granted*, 452 U.S. 959, *cert. amended*, 453 U.S. 911, *cert. dismissed*, 453 U.S. 951 (1981).

By contrast, convicted inmates may be punished, but not cruelly. Confinement is unconstitutionally cruel when prison officials exhibit "deliberate indifference" to "conditions posing a substantial risk of serious harm" to the inmate. *Farmer v. Brennan*, 511 U.S. --, 128 L.Ed.2d 811, 823 (1994). Though the totality of jail conditions can visit a constitutional deprivation on a convicted inmate, conditions may do so only to the extent that their

2

combined effect deprives an identifiable human need. *Wilson v. Seiter*, 501 U.S. 294, 115 L.Ed.2d 271, 283 (1991). But "[w]here both convicted inmates and pretrial detainees are housed together[,] the higher standard applicable under the due process clause should govern their common condition." *Inmates of Allegheny County Jail v. Wecht*, 874 F.2d 147, 153 (3d Cir. 1989).

2. Jail Condition Findings

The Court makes the following findings based on the testimony presented at the preliminary injunction hearing, the documents admitted into evidence, and the Court's tour of the detention facilities.

Cameron County's jail facilities were designed to hold 546 people. An additional facility designed to hold 192 detainees was within weeks of completion at hearing time. Under jail standards and management practices, counties typically limit occupancy to 85% of design capacity (467 for Cameron County) to allow for proper classification of detainees according to dangerousness. Overcrowding began in the County Defendant's detention facilities approximately three years ago. In April 1993, the facilities held approximately 700 people daily, and the population has steadily increased since then. At hearing time, Cameron County's facilities held 862 people.

Approximately 289 of these detainees were convicted felons awaiting transfer to state prisons operated by the Texas Department of Criminal Justice (TDCJ), whose board members comprise most of the State Defendants. Since 1987, the State Defendants adhered to their scheduled admissions policy, under which they limit intakes of state-ready felons from county jails to a specific number, they do not consider jail overcrowding as a factor in setting this

3

number, and they refuse to consider jail overcrowding as a reason for waiving this intake limit. *See* Tex. Gov. Code Ann. §§ 499.071, 499.072. TDCJ's scheduled admissions policy caused the backlog of convicted felons to accumulate in Cameron County's detention facilities. Felons have waited over one year in Cameron County's facilities for transfer to TDCJ custody because TDCJ officials have only allotted Cameron County an average of 12 spaces per month, and the County accumulates convicted felons much more rapidly.

State Defendants paid Cameron County $30 per day for housing each "state-ready" inmate, but County officials needed to complete certain paperwork to make each convict state-ready. *See* Tex. Code Crim. P. art. 42.09 § 8(a). The proper County officials did not appreciate this fact until the hearing. At hearing time, County officials had prepared the necessary paperwork for only approximately 189 of the 289 convicted felons in their facilities. Completion of the necessary paperwork takes no more than a few hours per detainee. Hence, the County forfeited significant amounts of available state funds.

The significant overcrowding adversely affects every aspect of detainee life in Cameron County. With 862 detainees, over 30% sleep on mattresses on the floor each night. This places all bunks and mattresses at a premium. Fighting requiring medical attention has increased with the steady increase in jail population. Disturbances by detainees protesting overcrowded conditions occurred in 1993.

Medical care in the facilities is alarming. The County bases its medical-care budget on a 500-person average occupancy, despite its knowledge that the actual occupancy is much higher. Even this budget provides for four nurses, but the County had only three hired. Thus, diabetics are treated with diet. Necessary drugs are unavailable. The County routinely

4

counts HIV-positive people among its detainees, but does not allocate resources for medical screening. At least one state-ready detainee died awaiting transfer to TDCJ. The State and County Defendants dispute whether TDCJ has been willing to accept custody of seriously infirm state-ready detainees from Cameron County. The County's medical professional, Dr. Stern, testified that a substantial risk of a tuberculosis epidemic existed at hearing time because of the poor ventilation in the County's oldest (and largest) facility, and because overcrowding prevents officials from effectively isolating the ever-present tuberculosis patients from the general population.

County officials still attempt to classify detainees according to dangerousness, but the overcrowding severely limits their success. Officials cannot adequately segregate mentally ill detainees due to overcrowding. Nor can they separate detained witnesses from the rest of the jail population. Pretrial detainees are not separated from convicted inmates due to overcrowding. Officials receive approximately eight written requests each day for reclassification. The classification that has been possible has lead to severe overcrowding in some cells. For example, 30 detainees have been forced into a cell designed for 10 and held there three months, where the cell did not have water, a toilet, or a shower. Six detainees have been forced into a holding cell designed for two, leaving at least two of these people with no choice but to stand all day.

Pre-trial detainees comprise the overwhelming majority of the jail population, and many stay in jail for significant periods of time. For example, of the 862 detainees present at hearing time, approximately 120 had waited in jail for over 60 days without having been indicted.

5

The parties have established that the State Defendants have funded a 192-bed addition to Cameron County's detention facilities, which was to have been completed within weeks of the preliminary injunction hearing in this case. Also, the State Defendants have commenced a program to significantly expand TDCJ's capacity to accept state-ready felons from county jails within the next year.

3. Apportionment of Liability

By the foregoing, Plaintiffs have provided this Court ample evidence to establish a substantial likelihood that they have been routinely subjected to genuine hardships and privations for significant time periods, and indeed, that they have endured substantial risk of serious physical harm from their conditions of confinement. They have proved the objective components of their constitutional claims. Still, the County and State Defendants contend that they cannot be held liable for any constitutional violations absent a clear showing that they exhibited deliberate indifference to Plaintiffs' confinement conditions. This Court assumes without deciding that deliberate indifference must be shown before pre-trial detainees are subjected to unconstitutional punishment.

a. State Defendants

Plaintiffs proved that the State Defendants, through their agents, were aware for over a year that Cameron County's detention facilities were overcrowded far beyond capacity, that the overcrowding was due to a backlog of state-ready felons, and that the jail held both state-ready felons and pre-trial detainees. Despite this knowledge, the State Defendants adhered to their scheduled admissions policy, which only permitted Cameron County to transfer approximately 12 detainees per month to TDCJ custody. Meanwhile, the backlog

6

accumulated and Plaintiffs were forced to endure objectively intolerable conditions.

The State Defendants argue that they could not have been deliberately indifferent to Plaintiffs' plight because: 1) they were given insufficient notice of unconstitutional conditions; 2) they took adequate actions to alleviate those conditions; or 3) they believed in good faith that they owed Plaintiffs no duty.

i. Notice

The Supreme Court recently addressed the notice required to support a finding of deliberate indifference:

> Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inferences from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. For example, if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was 'longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known about it, then such evidence could be sufficient [to support a finding of deliberate indifference].
>
> ... While the obviousness of a risk is not conclusive and a prison official may show that the obvious escaped him, he would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist....

*Farmer*, 511 U.S. at --, 128 L.Ed.2d at 828-29 & n.8 (citations omitted).

Since the State Defendants (or their predecessors in office) executed the consent decree in *Ruiz v. Lynaugh*, 811 F.2d 856 (1987), which established population caps on state prisons many years ago, they "expressly contemplated" that backlogs of state-ready felons

7

would accumulate in county jails. *Alberti v. Sheriff of Harris County*, 937 F.2d 984, 1001

(1991) (*Alberti I*). Cameron County officials testified that they have repeatedly urged Texas

officials to alleviate overcrowding in their facilities over the past three years. *See also* Tex.

Gov. Code Ann. § 499.122 (requiring Texas Commission on Jail Standards to "analyze

monthly the population of each jail in this state ..."). Significantly, the State Defendants

presented no evidence to indicate that they investigated whether conditions in Cameron

County's detention facilities met acceptable standards.

The State Defendants distinguish this case from *Alberti*, where they received detailed

reports concerning jail conditions from jail monitors. *See* 937 F.2d at 998. Under *Alberti I*

and *Farmer*, this Court finds that the State Defendants received sufficient information that

should have led them to investigate Cameron County's jail conditions, and their failure to do

so supports a finding of deliberate indifference against them. *Alberti I* establishes that the

issues presented in this case are not news to the State Defendants; here, the State Defendants

continue to demonstrate the recalcitrance that they maintained throughout the *Alberti*

litigation. *See Alberti v. Sheriff of Harris County*, 978 F.2d 893, 894-95 (5th Cir. 1992)

(*Alberti II*) (State Defendants' knowledge that their refusal to accept state-ready felons caused

severe overcrowding sufficiently supports a finding of deliberate indifference against them.).

While they may well not have had detailed knowledge of conditions in Cameron County's

jails, this is because the State Defendants chose to avoid learning about these conditions.

Indeed, their lack of detailed knowledge supports rather than undermines a finding of

deliberate indifference against them.

ii. Response

8

Next, the State Defendants argue that they cannot be found deliberately indifferent to Plaintiffs' hardships because they adequately responded to alleviate Cameron County's overcrowding problems upon learning of them even before initiation of this lawsuit. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at --, 128 L.Ed.2d at 830. The State Defendants' response to Cameron County's overcrowding has consisted of: 1) embarking on a state-prison expansion program designed to increase TDCJ intake of county-held state prisoners; 2) funding a 192-bed expansion for Cameron County's jail; 3) paying Cameron County $30 per day to hold each state-ready inmate; and 4) notifying counties that TDCJ will accept seriously infirm state-ready prisoners outside its scheduled admissions policy.

The first two of the State Defendants' responses are perfectly targeted to alleviate county-jail overcrowding while meting out fair punishment to convicted criminals, and are thus applauded and encouraged by this Court. These responses do not reasonably address Plaintiffs' constitutional complaints, however, because they obviously take too long to implement. While the State Defendants' building programs may well reasonably respond to the general problem of jail overcrowding at a future time, these programs do not represent reasonable responses to the constitutional deprivations suffered by Plaintiffs. The State Defendants simply cannot avoid liability for causing some detainees to suffer objectively intolerable conditions by arranging to improve conditions for future detainees.

This is especially true when the State Defendants had options available to them under Texas law according to which they could have quickly reduced Cameron County's jail

9

population to constitutionally tolerable numbers. First, the State Defendants could have accorded jail overcrowding significant weight in formulating their scheduled admissions policy. *See* Tex. Gov. Code Ann. § 499.071 (though Tex. Gov. Code Ann. § 499.072 forbids waiver of the allocation formula for county-jail overcrowding, § 499.071 expressly does not limit the factors that the State Defendants may consider in developing the formula itself). Second, the State Defendants could have taken custody of Cameron County's state-ready felons, and placed these people not in the state prisons governed by the *Ruiz* decree and the scheduled admission policy, but in county jails that are not overcrowded. *See* Tex. Gov. Code Ann. § 495.001 (authorizing the State Defendants to contract with counties and private vendors for extra prison space). The lack of evidence that the State Defendants investigated, let alone implemented, these options weighs toward deliberate indifference.

The State Defendants next point to their $30 *per diem* payments to the County Defendant as evidence of their concern for the immediate needs of detainees in Cameron County. Hearing evidence indicated that the County profits as much as $10 per inmate day from each state-ready felon. The State Defendants allege that if County officials had timely processed the paperwork for convicted felons, the County could have "earned" over $1 million, which would have enabled the county to fund ample space for all detainees.

For myriad reasons, the State Defendants' *per diem* payments do not reasonably respond to the risk of harm that faces Cameron County detainees. The payments are designed to compensate counties for providing adequate care and protection to state-ready prisoners, and this Court has uncontroverted evidence that the funds are sufficient for this purpose. But the overcrowding caused by the State Defendants' actions or inactions affects the County's

10

pre-trial detainees as well as the state-ready felons, and the State Defendants must bear
responsibility for deprivations wrought on the pre-trial detainees because of overcrowding that
they caused. The state's *per diem* amount was not calculated to ensure adequate protection
for all detainees, and it accordingly cannot absolve the State Defendants of liability for all
constitutional deprivations in the detention facilities.

Also, while the County Defendant did profit from the *per diem* payments and could
have used this money to improve jail conditions (especially medical care and jail-guard
protection), the profits were not proved sufficient to constitute a reasonable response from the
State Defendants. While the State Defendants presented evidence that the County profited
approximately $10 per day from the state-ready detainees, this profit would have been far less
had the County furnished adequate medical care and guard protection to the state-ready
detainees themselves. And the State Defendants' suggestion that the County could have
gotten a million dollars more in *per diem* payments and applied it all to jail construction fails
to recognize that the State's contribution of at least two-thirds of this million dollars would
have been applied toward the cost of maintaining the State's prisoners under substandard
conditions. To approach a reasonable response to county jail overcrowding caused by a
backlog of state-ready felons, the State Defendants must prove that they provided funds that
were sufficiently in excess of that necessary to adequately care for state-ready detainees to
provide for the extra medical care and guard protection due the County's pre-trial detainees as
a result of the state-ready felons' presence. The record lacks such evidence.

If the State Defendants intended the *per diem* funds to address anything other than the
normal cost of housing a detainee in an under-capacity jail, evidence of this fact in addition to

11

the raw *per diem* amount should not have been difficult to obtain.  The Court does not have evidence as to how the $30 figure was calculated.  Nor does the Court have evidence that the State Defendants conducted any monitoring as to how the County spent the funds that it received to improve overall conditions.  The Court accordingly finds that the State Defendants' evidence concerning their *per diem* payments is insufficient to refute Plaintiffs' evidence of the State Defendants' deliberate indifference.

Finally, the State Defendants allege that they accepted seriously infirm state-ready detainees outside their scheduled admissions policy.  Though the County Defendant submitted contradictory evidence, the Court need not resolve the dispute, for this response again fails to be reasonably calculated to address the immediate needs of the vast majority of the County's detainees, who are not seriously infirm.

                iii. Duty

Throughout this litigation, the State Defendants steadfastly denied both the duty and the ability to alleviate overcrowding in Cameron County's detention facilities by transferring state-ready detainees to other facilities.  The State Defendants relied on virtually identical arguments in the 1991 *Alberti* litigation to deny constitutional responsibility and to avert a finding of deliberate indifference.  *See Alberti I*, 937 F.2d at 994-97, 999-1000.

Of course, the Fifth Circuit controls this Court's view of the law.  The State Defendants are responsible for constitutional violations caused by their backlog of state felons in county jails.  *Alberti I*, 937 F.2d at 997.  The legislative declarations stressed by the State Defendants do not change this fact.  *See* Tex. Gov. Code Ann. § 499.121 (Vernon Supp. 1994) ("The legislature *declares* that until September 1, 1995, the institutional division shall

*continue* to perform its duty to accept inmates only as provided by the [§ 499.071] allocation formula [and] a county shall *continue* to perform its duty to confine and maintain under safe conditions and at the county's own expense each inmate eligible for transfer [to the State Defendants].") (emphasis added).  As stated above, Texas law enables the State Defendants to immediately relieve county-jail overcrowding by removing state-ready felons from overcrowded jails and placing them in state prisons, uncrowded county jails, or privately-run prisons.  Tex. Gov. Code Ann. §§ 495.001, 499.071; *Alberti I*, 937 F.2d at 999.  In fact, Texas law *requires* Texas officials to remove state-ready felons from unconstitutionally overcrowded county facilities, but only after "a state or federal court determines that conditions in a county jail are unconstitutional."  Tex. Gov. Code Ann. § 499.125.

The State Defendants counter that while *Alberti I* may impose responsibilities on them, it does not require that they always respond to overcrowding by removing detainees from county facilities.  True enough, but the *Alberti I* court also indicated that removal of state-ready felons from overcrowded county jails is an available and adequate response from the State Defendants.  937 F.2d at 999.  Absent another response that is at least proved to have been designed to effectively address the overcrowding problems caused by a state backlog, the State Defendants will be found deliberately indifferent because, by refusing to transfer detainees, they have obviously foregone an available option to remedy the problems.

Finally, the State Defendants argue that *In Re Clements*, 881 F.2d 145 (5th Cir. 1989) absolves them of responsibility for taking Cameron County's state-ready detainees, and prevents this Court from ordering them to do so.  *Clements* does no such thing; the Fifth Circuit only transferred partial remedial jurisdiction in the *Alberti* litigation (which addressed

13

the relative responsibilities of the Texas and Harris County to detainees in overcrowded

county facilities) to the court overseeing the *Ruiz* litigation (which addressed overcrowding in

state facilities). 881 F.2d at 154. The *Clements* court recognized that prison overcrowding

cases would arise in other counties like this one, but expressly limited its decision to the

Harris County facts before it. *Id.* at 152. The court specified the applicable standard: "[o]ur

only purpose is to avoid having a non-*Ruiz* court entertain the issuance of a decree that might

directly and substantially affect happenings within the Texas prison system." *Id.* at 154.

After recognizing that Harris County held 3600 state-ready felons, the court concluded:

> Here, it is clear that granting the relief sought in *Alberti* against
> [the State] might affect the Texas prison system. *We do not
> suggest that minor or indirect effects* are [disallowed].  But here
> we are dealing with the county having the largest population in
> Texas, apparently accounting for 25 percent of [the State's]
> intake.  Ordering that thousands of county inmates be promptly
> taken into [State] prisons is certainly something which would
> have a direct and substantial effect on the Texas prison system.

*Id.* at 153 & n.16 (emphasis added, quotation marks omitted).  The *Alberti I* court recently

relied on the *Clements* court's permissive reference to "minor or indirect effects" on the Texas

prison system to allow the State Defendants to be forced to deposit $750,000 for use by

Harris County to house its backlog of state-ready felons in the uncrowded jails of other

counties. *Alberti I*, 937 F.2d at 1003.  *Clements* does not preclude this Court from ordering

any relief against the State Defendants that only affects the Texas prison system in a minor or

indirect way, nor does it excuse the State Defendants from taking any state-ready felons from

Cameron County's custody.  Defendant and TDCJ board member Gilberto Hinojosa testified

that substantially increased state intake from Cameron County would have no substantial

impact on Texas's prison system, and this Court so finds. *Clements* certainly does not absolve

14

the State Defendants of their deliberate indifference to Plaintiffs' jail conditions, especially after the *Alberti I* court rejected their *Clements* arguments in 1991.

### b. County Defendant

Cameron County officials were always aware of their responsibility to provide "safe and suitable jails" for all those it detained, but they claim that the backlog of state-ready felons prevented them from doing so. *Cf. Alberti I*, 937 F.2d at 994; *Alberti II*, 978 F.2d at 895-96. The evidence contradicts the County's position, in that the County allocated funds for guards and medical care based on the design capacity of its facilities, though its officials were daily reminded that the actual population far exceeded the design capacity. The Court finds the County Defendant deliberately indifferent to Plaintiffs' confinement conditions.

Accordingly, Plaintiffs have established a substantial likelihood that they will succeed on the merits of their claim that the County and State Defendants have violated their Fourteenth Amendment rights.

## B. Irreparable Injury

The future deprivation of constitutional rights is irreparable harm *per se*, *Albro v. County of Onondaga*, 627 F. Supp. 1280, 1287 (N.D.N.Y. 1986), though this Court's preliminary remedy must be tailored to do no more than avert future constitutional deprivations. *See Ruiz v. Estelle*, 679 F.2d 1115, 1148 (5th Cir. 1982).

## C. Balance of Hardships

The Court finds that the hardships suffered by Plaintiffs, and those which will be suffered in the future absent relief, hugely outweigh any administrative and financial burden that this Court could legally impose on the County and State Defendants in this lawsuit.

D. Public Interest

Preliminary relief will serve the public interest by averting public health risks and reducing the potential for violent confrontation.

## II. COURT'S DISCRETION

Both the County and State Defendants urge this Court to exercise its discretion to withhold preliminary relief pending the opening of the new 192-bed county facility and the State Defendants' implementation of their prison expansion program. Plaintiffs, for their part, ask that this Court cap Cameron County's jail population to 85% of design capacity as required by the Texas Commission on Jail Standards.

In fashioning relief, this Court must allow state and county officials all possible latitude in operating their prison and jail systems. This latitude is only limited by this Court's responsibility to avert future violations of Plaintiffs' constitutional rights. Plaintiffs have proved that the County and State Defendants ignored Plaintiffs' rights in the recent past, and they are now entitled to this Court's protection from continuing or future similar violations without having to mobilize a new lawsuit. However, their proof of past violations does not entitle them to super-constitutional jail conditions except as necessary to avert future violations.

The Court's order respects these principles.

## III. REMEDY

Within five days after receiving this order, the State Defendants must either:

    a) adopt and implement the policies necessary to remove the number of state-ready felons from the custody of Cameron County officials that is necessary to

16

ensure that Cameron County's detention facilities are not populated above
design capacity; or

b) prove to this Court a reasonable probability that constitutional conditions
will be preserved at Cameron County's detention facilities if those facilities are
populated at a specific number greater than design capacity.

If the State Defendants elect to remove the requisite number of detainees, they are
entitled at any time to present the requisite evidence to this Court that Cameron County's
detention facilities may hold more than their design capacity of detainees under constitutional
conditions. Similarly, Plaintiffs may present evidence at any time that a population cap of
design capacity still subjects them to unconstitutional conditions. This Court will modify its
injunction to conform with additional evidence presented on this point.

Within twenty days of receiving this order, counsel for the County Defendant must
call a meeting with Plaintiffs' counsel and the County officials necessary to adopt and
implement an operation plan for Cameron County's detention facilities. Within thirty days of
receiving this order, the County Defendant must have adopted for it written plans for how it
will provide for its detention-facility needs six months in the future and two years in the
future. Without limitation, these plans will contain estimates for the number and type of
detainees who will be held in custody, the resources necessary to hold them under
constitutional conditions, and the revenue sources necessary to maintain a detention facility
that meets all federal and state constitutional, statutory, and regulatory standards. Plaintiffs
and their counsel will be permitted to comment to this Court on the plans. At minimum, the
County officials will evaluate and revise these plans annually and submit them to this Court.

17

Nothing in this Order is to be construed as modifying the Order of August 15, 1994

addressing the County procedures for insuring the expeditious processing of pretrial detainees.

SO ORDERED this 14th day of September, 1994 at Brownsville, Texas.

John Wm. Black
United States Magistrate Judge

18