13

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

U.S. COURT OF APPEALS
**FILED**

JAN 0 5 2001

CHARLES R. FULBRUGE III
CLERK

No. 99-41217

JOSE RAUL CASTILLO; FRANCISCO LOPEZ; E ELOY SANCHEZ; JON
ALAN ASHCRAFT; GUSTAVO ALMAGUER

Plaintiffs - Appellees

United States District Court
Southern District of Texas
FILED

FEB 0 1 2001

Michael N. Milby
Clerk of Court

v.

CAMERON COUNTY, TEXAS

Defendant - Third Party Plaintiff - Appellee

v.

STATE OF TEXAS; GEORGE W BUSH, Governor of Texas; ALLAN B
POLUNSKY, Member of the Board Texas Department of Criminal
Justice; CAROLE S YOUNG, Member of the Board Texas
Department of Criminal Justice; JOHN DAVID FRANZ, Member of
the Board Texas Department of Criminal Justice; PATRICIA A
DAY, Member of the Board Texas Department of Criminal
Justice; WILLIAM "HANK" MOODY, Member of the Board Texas
Department of Criminal Justice; ALFRED C MORAN, Member of
the Board Texas Department of Criminal Justice; NANCY
PATTON, Member of the Board Texas Department of Criminal
Justice; A M "MAC" STRINGFELLOW, Member of the Board Texas
Department of Criminal Justice; CAROL S VANCE, Member of the
Board Texas Department of Criminal Justice

Defendants - Third Party Defendants - Appellants

---

Appeal from the United States District Court
for the Southern District of Texas

---

Before KING, Chief Judge, PARKER, Circuit Judge, and FURGESON, District Judge.[*]

KING, Chief Judge:

Appellants, the State of Texas, et al., appeal from the district court's order continuing injunctive relief in favor of Appellees Jose Raul Castillo, et al.  For the following reasons, we VACATE the district court's July 20, 1999 order and REMAND this case to the district court for further proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL HISTORY

This appeal arises from a 42 U.S.C. § 1983 action brought in 1993 by Plaintiffs-Appellees (the "plaintiffs"), a certified class[1] of detainees in the Cameron County, Texas jail (the

---

[*]     District Judge of the Western District of Texas, sitting by designation.

[1]     The suit was originally filed by Jose Raul Castillo, Francisco Lopez, and Eloy Sanchez.  Their motion for class certification for the class consisting of "All prisoners of the Cameron County Jail as of 1/3/94" was granted on January 5, 1994. That class includes both pretrial detainees and convicted inmates.  However, we note that if all prisoners as of January 3, 1994 have since left the jail, that would mean there is no class member who is entitled to seek injunctive relief.  On remand, the district court should look into the matter of whether, because of this fact, this case is moot, see Davis v. Ball Mem'l Hosp. Ass'n, Inc., 753 F.2d 1410, 1416 (7th Cir. 1985) ("When the claims of all the class members are moot, the action is moot."). See generally CHARLES ALAN WRIGHT ET AL., 13A FEDERAL PRACTICE AND PROCEDURE § 3533.9, at 401 (2d ed. 1984) ("[I]f the claim of the entire class is moot, the case is finished.").

2

CSitPDF - www.favisa.com

"Jail") against Cameron County (the "County") and the state of Texas, the governor of Texas, and various members of the Board of the Texas Department of Criminal Justice (the "State").[2]  The plaintiffs alleged that overcrowding at the Jail produced conditions that constituted cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments of the U.S. Constitution.

The plaintiffs originally filed suit against only the County.  The County brought a third-party complaint seeking injunctive relief against the State, alleging that the State failed to expeditiously transfer nearly 300 "paper ready" inmates[3] to state correctional facilities and, therefore, was responsible for the constitutional violations.  On January 21, 1994, the plaintiffs filed an amended complaint, adding the State as a defendant, and on May 20, 1994, they filed an application for a preliminary injunction, in an attempt to remedy the overcrowding by enjoining the County and the State from incarcerating more prisoners in the Jail than allowed by the Texas Jail Standards.

---

[2]     The State was not brought in to the suit until January 1994.

[3]     "Paper ready" inmates are those that are certified for transfer to the institutional division of the Texas Department of Criminal Justice, but who have yet to be transferred.

3

CUtePDF - www.fasize.com

On August 15, 1994, the district court entered a temporary injunction in favor of the plaintiffs to reduce the jail population (the "August 1994 injunction").[4]  Then, on September 14, 1994, the district court entered a memorandum decision and order, which included a preliminary injunction against the State and the County (the "September 1994 injunction").

In its September 1994 injunction, the court made a number of findings, based on testimony presented at the preliminary injunction hearing, the documents admitted into evidence, and the court's tour of the detention facilities.  The court found that the Jail was overcrowded and that 289 of the detainees were convicted felons awaiting transfer to state prisons operated by the Texas Department of Criminal Justice ("TDCJ").  The court also found that, at that point in time, TDCJ had a scheduled admissions policy that had caused a backlog of convicted inmates to accumulate in the Jail.[5]  As a result of this significant

---

[4]    The August 1994 injunction was amended on October 2, 1997, and it is that amended version that is at issue in this proceeding.

[5]    The Jail, at the time of the issuance of the September 1994 injunction, was designed to hold 546 people.  However, under jail standards and management practices, counties typically limit occupancy to 85% of design capacity, which, the court stated, in this case, would have been 467 detainees, significantly less than the 862 detainees housed in the Jail at the time.
We note that an additional facility designed to hold 192 detainees was within weeks of completion at the time of the hearing on the September 1994 injunction, and, during oral

4

overcrowding, over thirty percent of the detainees slept on
mattresses on the floor each night.  Additionally, fighting
requiring medical attention increased.  The court also found the
medical care received by the inmates to be "alarming" as the
County based its medical-care budget on a 500-person average
occupancy, rather than the actual occupancy.[6]  Furthermore,
overcrowding limited the attempts by county officials to classify
detainees according to dangerousness and to adequately segregate
mentally ill detainees, witnesses, and pretrial detainees.

> The classification that has been possible has lead
> [sic] to severe overcrowding in some cells.  For
> example, 30 detainees have been forced into a cell
> designed for 10 and held there three months, where the
> cell did not have water, a toilet, or a shower.  Six
> detainees have been forced into a holding cell designed
> for two, leaving at least two of these people with no
> choice but to stand all day.[7]

---

argument on this appeal, the County announced that construction
had begun on a new facility designed to hold an additional 641
people.

[6]  The court found that, since medicine was unavailable,
diabetics were treated with diet, other necessary drugs were also
unavailable, and no funds for medical screening for HIV-positive
people were allocated.  One expert testified that there existed a
substantial risk of a tuberculosis epidemic at the time of the
hearing.

[7]  These findings established to the district court's
satisfaction the substantial likelihood that the plaintiffs could
prove a constitutional violation.  The court also found
sufficient evidence to show a substantial likelihood that the
plaintiffs could prove the required "deliberate indifference" on
the part of the State and the County.  The court found that
overall, these elements established a substantial likelihood that
the plaintiffs would succeed on the merits of their claim.

5

Under the terms of the September 1994 injunction, the State was required to "remove the number of state-ready felons from the custody of Cameron County officials" necessary to bring the Jail's population within design capacity or prove that constitutional conditions would be preserved if the Jail contained more prisoners than it was designed to hold.[8]  The September 1994 injunction also required the County to adopt an operation plan describing how the County would provide for the Jail's needs six months in the future and two years in the future, to evaluate and revise those plans on an annual basis, and to submit them to the district court.

On October 2, 1997, the district court amended the August 1994 injunction ("1997 injunction").  The 1997 injunction lists, inter alia, a number of actions intended to reduce the jail

---

The court also found that the three other elements necessary to grant a preliminary injunction had been satisfied, namely a substantial threat that the movant will suffer irreparable injury, that the threatened injury outweighs any damage the injunction may cause the opponent, and that the injunction will not disserve the public interest.  See United Offshore Co. v. S. Deepwater Pipeline Co., 899 F.2d 405, 407-08 (5th Cir. 1990).

[8]     The court also indicated its willingness to modify the injunction should the State present evidence that the Jail might hold more than its design capacity of detainees under constitutional conditions or should the plaintiffs present evidence that a population cap of design capacity still subjected them to unconstitutional conditions.

population[9] and a number of Population Reduction Provisions that the Cameron County sheriff can make to keep the prison population from surpassing ninety percent of its design capacity. Specifically, the injunction dictates that "if at any time the population of the Cameron County Jail exceeds ninety per cent of the design capacity . . . for such jail, the Sheriff of Cameron County is ORDERED to, and shall, in addition to any other actions he may deem appropriate, take such of the following [Population Reduction Provisions] he may see fit in order to reduce jail population . . . ." For example, one of the Population Reduction Provisions permits the sheriff to "refuse to receive for pre-hearing confinement from state pardon and parole officers any 'blue warrant' person charged with a parole violation."[10]

───────────────────────

[9]   For example, the injunction prohibits the Jail from accepting individuals charged with misdemeanors from other nonfederal agencies, unless, for warrantless arrests, the detainee's commitment papers include an order in a specified form finding probable cause or, for warrant arrests, the detainee's commitment papers include a copy of the executed arrest warrant. The injunction also covers treatment of persons accused of felonies from other nonfederal agencies and persons arrested by the sheriff's office.

[10]   A "blue warrant" person "means a person arrested for a parole violation who is to be detained pending administrative process and revocation hearing." Other Population Reduction Provisions include arrangements for alternative housing or for "scheduled reporting," refusal to take from any law enforcement officers any person charged with a non-violent misdemeanor or felony, release of misdemeanor detainees on bond, and release of non-violent pretrial detainees upon application to a judge of a court of competent jurisdiction.

7

Similarly, "the Sheriff may notify the Department of Pardons and Parole that the 'blue warrant' inmates will be released after they have been held for forty-five days unless a ['] white warrant' has issued."[11]  Although the 1997 injunction was issued while the State was still a party to the proceedings, it did not require the State to take any particular action, only the County. Pursuant to the 1997 injunction, the Cameron County sheriff refused to incarcerate a number of "blue warrant" parole violators.[12]

On April 26, 1996, the Prison Litigation Reform Act (the "PLRA"), which "establishes standards for the entry and termination of prospective relief in civil actions challenging prison conditions," went into effect.  See Miller v. French, 120 S. Ct. 2246, 2250 (2000); see also Pub. L. No. 104-134, 110 Stat. 1321-66 (1996).  On May 3, 1999, pursuant to the PLRA, the State filed a motion to terminate the September 1994 injunction.  The State argued that immediate termination of the preliminary injunction was warranted because the PLRA requires termination of prospective relief entered without making certain specific findings, which the district court had not made when it issued

---

[11]    A "white warrant" person means a person detained after revocation of parole.

[12]    The parties stipulated that by July 27, 1999, there were at least 289 individuals who had outstanding blue warrants.

8

CSVPDF - www.fastio.com

the September 1994 injunction.  <u>See</u> 18 U.S.C. § 3626(b)(2).
Alternatively, the State asserted that the September 1994
injunction must be terminated because the PLRA mandates
termination of prospective relief upon the motion of any party or
intervener two years after the date the court granted or approved
the prospective relief or two years after the enactment date of
the PLRA.  <u>See</u> <u>id.</u> § 3626(b)(1).

On May 21, 1999, the district court held a status
conference.  The parties agreed that the September 1994
injunction against the State was no longer necessary, as the
State had transferred the "paper ready" prisoners to state
facilities.  Because the State had complied with the September
1994 injunction, the parties also discussed dismissing the State
as a party.  Moreover, the district court indicated that it was
inclined to turn the 1997 temporary injunction against the County
into a permanent injunction.  The County proposed an order so
doing, to which the State objected. Specifically, the State
objected to a provision in the order that permitted the Cameron
County sheriff to continue to refuse to incarcerate alleged
parole violators in order to limit the number of prisoners in the
Jail.  The State contended that this provision violated the PLRA,
which prohibits federal courts from ordering prospective relief
that violates state law.

9

On May 27, 1999, the district court entered an order extending the September 1994 injunction for another sixty days so that the plaintiffs and the County could finalize a consent decree. During those sixty days, on June 28, 1999, the State filed an "advisory," reiterating its objection to continuing the temporary injunctive relief embodied in the 1997 injunction as violative of the PLRA. The State argued, <u>inter alia</u>, that the 1997 injunction constituted a prisoner release order, which, under the PLRA, can only be entered by a three-judge panel that is required to make specific findings, <u>see id.</u> § 3626(a)(3), and that order authorized the Cameron County sheriff to violate state law, action which is also governed by the PLRA. <u>See id.</u> § 3626(a)(1)(B).

On July 27, 1999, the district court held another status conference ("July 27 hearing") that addressed the September 1994 injunction, the 1997 injunction, and the dismissal of the State as a party to the proceedings. The State argued that the district court should terminate the September 1994 injunction because it did not contain the findings required by the PLRA for the granting of prospective relief, a requirement that was to be applied retroactively. The County agreed that the September 1994 injunction should be terminated, but the plaintiffs argued that

10

the injunction should be continued to prevent the State from again overcrowding the Jail.

In regard to the 1997 injunction, the State objected that it also violated the PLRA, in that the court had not made the proper findings when granting the relief and, also, that it constituted a prisoner release order, which, under the PLRA, may only be issued by a three-judge panel.  See 18 U.S.C. § 3626(a)(3)(B). The County and the plaintiffs contended that the 1997 injunction should be continued and that the court had made the requisite findings.

Finally, all three parties agreed that the State should be dismissed as a party.  However, the State wanted a proviso that it was still concerned about sheriff's ability to refuse to incarcerate blue warrant violators.

The district court entered a minute order on July 27, 1999, dismissing the State from the lawsuit.  On July 30, 1999, the district court entered an order (the "1999 order") denying the State's motion to terminate and continuing both the September 1994 injunction and "all other preliminary injunctive relief granted by this Court."  In making its determination, the court considered all of the arguments made at the July 27 hearing, the stipulation made by all parties that there were at least 289 blue warrants in the County and that the Jail would be well over 100%

capacity if those 289 persons were incarcerated, an affidavit
filed by Captain Luis Esparza,[13] and the stipulation filed by the
County and the plaintiffs on July 29, 1999.[14]  Additionally, the
district court took judicial notice "of all evidence previously
presented in this case."

At the time the district court issued the 1999 order, it
also purported to make the findings required by the PLRA to limit
the termination of relief otherwise subject to termination.  The
order provided:

> In making this decision, the Court specifically finds
> that, without the continuation of the temporary
> injunction, the Cameron County Jail population would
> almost immediately exceed 100% and thereby created
> [sic] Constitutionally prohibited jail conditions.  The
> Court specifically finds that prospective relief,
> including the continuation of the temporary injunction,
> remains necessary to correct and prevent a current and
> ongoing violation of the Class Plaintiffs' Federal

---

[13]     In his affidavit, Esparza, who has been the Captain of
the Jail since April 15, 1999, states the following facts: (1) the
capacity of the Jail is 738 inmates; (2) as of July 28, 1999 the
population of the Jail was 662 inmates, which included 17 blue
warrants and 8 white warrants; (3) the 662 inmates includes 515
state inmates and 147 federal inmates; (4) the [October 1997
injunction] has been necessary to keep jail population from
overcrowding; and (5) the Jail has been at or about 90% of
capacity for the past couple of years and that "[w]ithout the
ability to refuse new non violent [sic] inmates when we are
approaching or at 90% of capacity we would exceed capacity within
one week and would have over one thousand inmates within one
month."

[14]     The plaintiffs and the County stipulated to the facts
in the affidavit of Luis Esparza.  We note that the State did not
so stipulate.

Constitutional rights, that the temporary injunction
extends no further than necessary to correct the
violation of the Class Plaintiffs' Constitutional
rights, and that the temporary injunction is narrowly
drawn and is the least intrusive means to correct the
violation.

The State timely appeals the 1999 order.[15]

## II. STANDARD OF REVIEW

Standing is reviewed under a de novo standard.  See Tex.
Office of Pub. Util. Counsel v. FCC, 183 F.3d 393, 419 n.34 (5th
Cir. 1999) (citing 5 U.S.C. § 706).  Although the district
court's decision to continue the injunctions is to be reviewed
for an abuse of discretion, see Alcatel USA, Inc. v. DGI Techs.,
Inc., 166 F.3d 772, 790 (5th Cir. 1999), because the district
court's decision to terminate or continue the injunctions turns
on the application of § 3626(b) of the PLRA, that interpretation
is reviewed de novo.  See Woodfield v. Bowman, 193 F.3d 354, 358
(5th Cir. 1999).

The application of the relevant sections of the PLRA
requires the district court to make a finding of an ongoing
constitutional violation, which is a mixed question of law and
fact.  See Inmates of Suffolk County Jail v. Rouse, 129 F.3d 649,
661 (1st Cir. 1997), cert. denied, 524 U.S. 951 (1998).  We

---

[15]     The County does not appeal the 1999 order.

13

review mixed questions of law and fact de novo.  See Cargill,
Inc. v. United States, 173 F.3d 323, 333 n.13 (5th Cir. 1999).

### III. STANDING

As a threshold matter, we must determine whether the State
has standing to pursue this appeal.  The plaintiffs argue that
the State lacks standing to appeal the 1999 order because it is
no longer a party to the action and, therefore, is no longer
bound by or required to take any action in regard to the
injunctions.  Recognizing that, in some cases, a nonparty has
standing to appeal an injunction that affects it, the plaintiffs
contend that the injunction did not require the State to take any
particular action or cause the State to suffer any injury, and,
therefore, did not affect the State.  Alternatively, the
plaintiffs argue that, even if the State is bound by the
injunction, the State has no standing to appeal to set aside the
injunctive provisions against the County, a co-party that did not
appeal.

The State argues that it has standing because the PLRA
expressly gives it standing to challenge this type of prospective
relief.  Additionally, it contends that, even as a nonparty, it
has standing to appeal an injunction that adversely affects it.
We agree.

14

## A. Standing Under the PLRA

The PLRA expressly provides for standing for certain officials and units of government.  As § 3626 (a)(3)(F) of the PLRA provides:

> Any State or local official including a legislator or unit of government whose jurisdiction or function includes the appropriation of funds for the construction, operation, or maintenance of prison facilities, or the prosecution or custody of persons who may be released from, or not admitted to, a prison as a result of a prisoner release order shall have standing to oppose the imposition or continuation in effect of such relief and to seek termination of such relief, and shall have the right to intervene in any proceeding relating to such relief.

18 U.S.C. § 3626(a)(3)(F) (2000) (emphasis added).  The PLRA then defines a "prisoner release order" to "include[] any order, including a temporary restraining order or preliminary injunctive relief, that has the purpose or effect of reducing or limiting the prison population, or that directs the release from or nonadmission of prisoners to a prison."  Id. § 3626(g)(4).  Therefore, if the 1999 order (which, as noted above, expressly continues the September 1994 injunction and "all other temporary injunctive relief currently in effect") fits within the definition of a prisoner release order, the statute gives the State both standing and the right to seek its termination or oppose its continuation.

15

The first question we must answer, then, is whether the
injunctions contained or continued in the 1999 order are prisoner
release orders.  We find that they are.  The September 1994
injunction requires the State to "adopt and implement the
policies necessary to remove the number of state-ready felons
from the custody of Cameron County officials that is necessary to
ensure that Cameron County's detention facilities are not
populated above design capacity."  Similarly, the October 1997
injunction orders the Sheriff of Cameron County, "if at any time
the population of Cameron County Jail exceeds ninety per cent of
the design capacity," to "take such of the following actions he
may see fit in order to reduce jail population."  Both of these
injunctions cap the prison population at a particular number of
detainees, which has the "purpose or effect of reducing or
limiting the prison population."

These types of "population caps" have consistently been
found to meet the definition of a prisoner release order.  See
Ruiz v. Estelle, 161 F.3d 814, 825-27 (5th Cir. 1998) (finding
final judgment that set specific population limits on number of
prisoners allowed to be housed in various prisons to be a
prisoner release order), cert. denied, 526 U.S. 1158 (1999); see
also Tyler v. Murphy, 135 F.3d 594, 596 (8th Cir. 1998) (holding
that twenty-person cap on probation detainees in a particular

16

prison was a prisoner release order).  In fact, a review of the
legislative history of the PLRA reveals that it was precisely
these types of caps that the statute was created to address.
See 141 CONG. REC. S14413-14414 (daily ed. Sept. 27, 1995)
(statement of Sen. Dole)("Perhaps the most pernicious form of
judicial micromanagement is the so-called prison population
cap.").

The September 1994 injunction requires the State to adopt
policies that will keep the population of the Jail at design
capacity.  The October 1997 injunction requires the sheriff to
keep the prison at or below ninety-percent capacity.  We
therefore find that these injunctions are prisoner release orders
as defined by the PLRA, and therefore, under the PLRA, the State
has the right "to oppose the imposition or continuation in effect
of such relief and to seek termination of such relief."  18
U.S.C. § 3626(a)(3)(F).

## B. Nonparty Standing to Appeal

In addition to this express statutory grant of standing, we
also find that the State possesses sufficient interest in the
litigation to qualify for nonparty standing to appeal.  The
plaintiffs argue that the State, as a nonparty, lacks standing to
appeal the 1999 order because the State is no longer a party to

17

the lawsuit and because the State was not bound or otherwise
injured by the injunctions continued in the 1999 order.  The
State contends that, even as a nonparty, it has standing to
appeal the order because it adversely affects its interests.  We
agree.

Plaintiffs correctly assert the general rule that nonparties
cannot appeal the court's judgment.  See Marino v. Ortiz, 484
U.S. 301, 304 (1987) ("The rule that only parties to a lawsuit,
or those that properly become parties, may appeal an adverse
judgment, is well-settled.").  However, that rule has not been
rigidly adhered to; a nonparty may be allowed to appeal if the
decree affects his interests.  As we stated in United States v.
Chagra:

> '[I]f the decree affects [a third party's] interests,
> he is often allowed to appeal.' . . . Thus, a non-party
> may appeal orders for discovery if he has no other
> effective means of obtaining review.  Similarly non-
> parties have been allowed to appeal orders granting or
> denying further disclosure of documents already in the
> possession of a court or grand jury.  Non-party
> creditors who assert rights in receivership proceedings
> may appeal orders affecting their legitimate interests.
> If an injunction extends to non-parties, they may
> appeal from it.

701 F.2d 354, 358-59 (5th Cir. 1983) (alterations in original)
(footnotes and citation omitted); see also United States v.
Kirschenbaum, 156 F.3d 784, 794 (7th Cir. 1998) ("[N]on-parties
who are bound by a court's equitable decrees have a right to move

18

to have the order dissolved, . . . and other circuits have held that where a non-party is purportedly bound by an injunction, the non-party may bring an appeal rather than face the possibility of a contempt proceeding."); In re Estate of Ferdinand Marcos Human Rights Litig., 94 F.3d 539, 544 (9th Cir. 1996) (finding standing for nonparty where injunction confronted nonparty "with the choice of either conforming its conduct to the dictates of the injunction or ignoring the injunction and risking contempt proceedings"); In re Piper Funds, Inc., Institutional Gov't Income Portfolio Litig., 71 F.3d 298, 301 (8th Cir. 1995) ("A nonparty normally has standing to appeal when it is adversely affected by an injunction."). However, allowing nonparties to appeal a court's judgment is still a rare exception to the general rule.

In order to determine if a nonparty may properly appeal, this court has adopted a three-part test,[16] analyzing "whether

_____

[16] This test addresses the prudential concerns relevant to a standing analysis, as opposed to the constitutional considerations of Article III. See United States v. McVeigh, 106 F.3d 325, 334 n.7 (10th Cir. 1997) ("Article III authority is a prerequisite to judicial review, however sought. In contrast, a prudential concern, such as nonparty status, counseling uniquely or primarily against the propriety of appeal, need not bar a petition for mandamus review."). It is unclear if the plaintiffs have argued that the State lacks Article III standing; however objections to standing may be raised by an appellate court sua sponte. See Lang v. French, 154 F.3d 217, 222 n.28 (5th Cir. 1998). "To have standing a plaintiff must establish three elements: '[T]he plaintiff must show that it has suffered an

19

CutePDF - www.tasica.com

'the non-parties actually participated in the proceedings below, the equities weigh in favor of hearing the appeal, and the non-parties have a personal stake in the outcome.'" Searcy v. Philips Elecs. N. Am. Corp., 117 F.3d 154, 157 (5th Cir. 1997); EEOC v. La. Office of Cmty. Servs., 47 F.3d 1438, 1442-43 (5th Cir. 1995); see also Commodity Futures Trading Comm'n v. Topworth Int'l, Ltd., 205 F.3d 1107, 1113 (9th Cir. 1999) (stating that a nonparty to the litigation on the merits will have standing to appeal the decision when the party participated in the proceedings and the equities favor hearing the appeal); Davis v. Scott, 176 F.3d 805, 807 (4th Cir. 1999); Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc., 141 F.3d 490, 496 (3d Cir. 1998); Binker v. Commonwealth of Pa., 977 F.2d 738, 745 (3d Cir. 1992).

We find that under this standard, the State is permitted to appeal the continuance of the injunctions. First, there can be no question in this instance that the State has been an active participant in the proceedings. From the time the plaintiffs

_____

injury in fact, the plaintiff must establish causation[, and] there must be redressability.'" Pederson v. La. State Univ., 213 F.3d 858, 869 (5th Cir. 2000). We find the injury in fact requirement to be satisfied in this instance by the same facts that demonstrate the State has a "personal stake in the outcome," analyzed below. Additionally, we find the causation and redressability requirements to be satisfied because the injunctions precipitated the violations and their termination will end them.

20

first amended their complaint to just two days before the
continuance of the injunctions, the State was a named party to
the proceedings.  In fact, the State brought the very motion that
was denied in the order that is being appealed.

Second, the equities weigh in favor of allowing the State to
appeal.  Given that the PLRA itself gives the State the right to
seek the termination of injunctive relief, it seems unjust to
deny them standing to appeal the denial of that termination.[17]
Similarly, as the State filed the original motion to terminate
the injunctions, and maintained that position at the July 30
hearing, we find it unfair to continue the injunctions without
permitting the State to appeal the continuation.  Therefore, we
conclude that the equities of the situation weigh in favor of
allowing the State to appeal.

Under the third prong, the State must show it has a personal
stake in the outcome.[18]  We find that it does.  First, the

---

[17]     This is similar to a result we reached in Searcy.  In
Searcy, the court found that because Congress granted the
government the right to withhold consent to voluntary
settlements, "it would be odd to preclude appellate remedies
based on the government's failure to intervene."  Searcy, 117
F.3d at 157.

[18]     As an example, in Searcy, this court found this prong
satisfied by a settlement stretching to "'all claims and
counterclaims asserted in any pleading or other filing in this
action . . . arising out of the transactions and occurrences that
are the subject matter of this action.'"  Searcy, 117 F.3d at
157.  The court determined that the order could arguably be

21

State's economic interests are implicated.  Although the State

had been dismissed as a party, prior to the 1999 order continuing

the injunctions, no changes were made to the September 1994

injunction itself, which requires the State to remove paper-ready

prisoners within forty-five days.  In <u>Loyd v. Alabama Department</u>

<u>of Corrections</u>, 176 F.3d 1336, 1341 (11th Cir.), <u>cert denied</u>, 120

S. Ct. 613 (1999), the Eleventh Circuit held that requiring the

state to transfer prisoners from county to state jails within a

specified period of time impacts the economic interests of the

state because it must have facilities available for the transfer.

We agree.  Second, should the State violate the September 1994

injunction it risks being found in civil contempt.  "'A party

commits contempt when he violates a definite and specific order

of the court requiring him to perform or refrain from performing

a particular act or acts with knowledge of the court's order.'"

<u>Travelhost, Inc. v. Blandford</u>, 68 F.3d 958, 961 (5th Cir. 1995)

(citing <u>SEC v. First Fin. Group of Tex., Inc.</u>, 659 F.2d 660, 669

(5th Cir. 1981).  As the State was a party to the proceedings

when the September 1994 injunction was originally issued, it

could reasonably believe itself at risk of civil contempt if it

violated the injunction, regardless of whether it has since been

---

interpreted to include the government for claim preclusion
purposes, which gave the government a stake in the outcome.   <u>Id.</u>
at 158.

CMsPDF - www.texla.com

dismissed as a party.  Therefore, the State has a sufficient personal stake in the outcome to challenge the continuation of the September 1994 injunction.

In regard to the October 1997 injunction, even though the State is not required to perform or refrain from performing any particular acts by the its terms, we find the State's sovereign and quasi-sovereign interests to be implicated.  First, the October 1997 injunction allows the sheriff, in violation of state law, to refuse to incarcerate state parole violators for whom blue warrants have been issued.  The State has a sovereign interest in enforcing its laws.  <u>See</u> <u>Alfred L. Snapp & Son, Inc.</u> <u>v. Puerto Rico</u>, 458 U.S. 592, 601-02 (1982) ("Two sovereign interests are easily identified: First, the exercise of sovereign power over individuals and entities within the relevant jurisdiction—this involves the power to create and enforce a legal code, both civil and criminal."); <u>Tex. Office of Pub. Util.</u> <u>Counsel v. FCC</u>, 183 F.3d 393, 449 (5th Cir. 1999) ("[S]tates have a sovereign interest in 'the power to create and enforce a legal code.'") (citing <u>Snapp</u>, 458 U.S. at 601).  Because the State has a sovereign interest in enforcing its laws, it has a personal stake in appealing the October 1997 injunction that gives the County discretion to violate those laws.

23

Second, all of the parties stipulated that there were 289 blue warrant violators who, but for the injunction, would be required under state law to be housed in the Jail.  This implicates the State's quasi-sovereign interest in protecting its citizens from criminal activity.  See Snapp, 458 U.S. at 602 ("Quasi-sovereign interests stand apart from [sovereign interests, proprietary interests, or private interests pursued by the State as a nominal party] . . . . They consist of a set of interests that the State has in the well-being of its populace.").  While we recognize that the concept of quasi-sovereign standing "risks being too vague to survive the standing requirements of Article III," id. at 602, we find the State's interest at issue here falls within the category of "a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general."  Id. at 607.  As a result of this injunction, parole violators who should be incarcerated remain free, potentially increasing the level of criminal activity.  The State has a legitimate interest in "protect[ing] its citizens from criminal elements."  Nat'l People's Action v. Village of Wilmette, 914 F.2d 1008, 1011 (7th Cir. 1990) (citing Hynes v. Mayor & Council of Borough of Oradell, 425 U.S. 610, 618 (1976)).  This quasi-sovereign

CIMPDF – www.fastio.com

interest also gives the State a personal stake in the outcome of the appeal.

For the reasons stated above, we find the State satisfies the three-part standard set out in <u>Searcy</u> and, therefore, has standing to appeal the 1999 order.

## IV. TERMINATION OF RELIEF UNDER § 3626(b)

The PLRA "establishes standards for the entry and termination of prospective relief in civil actions challenging prison conditions." <u>Miller v. French</u>, 120 S. Ct. 2246, 2250 (2000). The PLRA both "narrowly limits the relief a court may order in prisoner suits," <u>Ruiz v. Estelle</u>, 161 F.3d 814, 817 (1998), <u>cert. denied</u>, 526 U.S. 1158 (1999), and "authorizes the termination of existing prospective relief that does not comply with these limits." <u>Id.</u>

Regarding termination of prospective relief,[19] the PLRA distinguishes between immediately terminable relief and relief that is terminable after a specified period of time has passed. The requirements for the former are set out in § 3626(b)(2):

In any civil action with respect to prison conditions, a defendant or intervener shall be entitled to the

---

[19]     The PLRA defines "prospective relief" as "all relief other than compensatory monetary damages." 18 U.S.C. § 3626(g)(7). The relief contained in the injunctions is, therefore, considered prospective relief.

immediate termination of any prospective relief if the relief was approved or granted in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

Id. § 3626(b)(2). The requirements for the latter are set out in § 3626(b)(1):

(A) In any civil action with respect to prison conditions in which prospective relief is ordered, such relief shall be terminable upon the motion of any party or intervener—
(i) 2 years after the date the court granted or approved the prospective relief;
(ii) 1 year after the date the court has entered an order denying termination of prospective relief under this paragraph; or
(iii) in the case of an order issued on or before the date of enactment of the Prison Litigation Reform Act, 2 years after such date of enactment.

Id. § 3626(b)(1). However, both of these termination provisions are subject to the limitation of § 3625(b)(3), which provides that

Prospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation.

18 U.S.C. § 3626(b)(3).

To determine whether the district court erred in its decision to continue the September 1994 injunction and the 1997

26

CVMPDF – www.texlra.com

injunction, we must first ascertain if the injunctions were terminable under either § 3626(b)(1) or § 3626(b)(2) and, if so, decide whether the requirements to continue the relief mandated by § 3626(b)(3) were met.

## A. The Injunctions Are Terminable Under § 3626(b)(1)

The State contends that both the September 1994 injunction and the 1997 injunction were entered without the findings required by § 3626(b)(2) and that, therefore, it is entitled to immediate termination of the prospective relief. Additionally, it argues that it is entitled to termination under § 3626(b)(1), because more than two years have elapsed since the district court granted the prospective relief. Therefore, the State asserts that the district court erred in refusing to terminate the injunctions because it was required to do so, unless the court made the written findings based on the record required by § 3626(b)(3), which it did not do. Specifically, the State claims that the record does not support the court's finding that the injunctions (1) were necessary to remedy a "current and ongoing" violation of a federal right, (2) were narrowly drawn, and (3) were the least intrusive means necessary to correct the violation of the federal right (the "§ 3626(b)(3) findings"). The plaintiffs assert that not only were the § 3626(b)(2)

27

findings made when the district court granted the September 1994 injunction and the 1997 injunction, but that, even if they were not, the district court, in its 1999 order, made the § 3626(b)(3) findings that allow the court to continue the relief.

We need not determine whether it was necessary for the district court to expressly make the § 3626(b)(2) findings or if the findings may be implied from the court's judgment because we find that both the September 1994 injunction and the 1997 injunction fall squarely within the termination provision of § 3626(b)(1)(iii) as more than two years have passed since the enactment of the PLRA.  Even though the injunctions at issue were granted prior to the enactment of the PLRA, the termination provisions of § 3626(b)(1) still apply.  When enacting the PLRA, Congress specifically provided that "'[Section 3626] shall apply with respect to all prospective relief whether such relief was originally granted or approved before, on, or after the date of the enactment of this title.'"  <u>Martin v. Hadix</u>, 527 U.S. 343, 355 (1999) (alteration in original) (quoting § 802(b)(1), note following 18 U.S.C. § 3626 (1994 ed., Supp. III)).  Additionally, the provision itself provides that "in the case of an order issued on or before the date of enactment of the Prison Litigation Reform Act, [such relief shall be terminable upon the motion of any party or intervener] 2 years after such date of

28

enactment."  18 U.S.C. § 3626(b)(1)(iii).  The PLRA was enacted
on April 26, 1996, and the State, at the time a party to the
proceeding, filed its motion for termination on May 3, 1999, more
than three years later.  Therefore, the relief is terminable
unless the findings set out in § 3626(b)(3) are made.

## B. The Record Inadequately Supports the District Court's Need-Narrowness Findings

Section 3636(b)(3) provides that prospective relief will not
terminate if the court "makes written findings based on the
record" that (1) "prospective relief remains necessary to correct
a current and ongoing violation of the Federal right," (2)
"extends no further than necessary to correct the violation of
the Federal right," and (3) "that the prospective relief is
narrowly drawn and the least intrusive means to correct the
violation."  18 U.S.C. § 3626(b)(3).

We first note that a "current and ongoing" violation is one
that "exists at the time the district court conducts the
§ 3626(b)(3) inquiry."  Cason v. Seckinger, 231 F.3d 777, 784
(11th Cir. 2000); see also Hadix v. Johnson, 228 F.3d 662 (6th
Cir. 2000)(stating that "the PLRA directs a district court to
look to current conditions"); Benjamin v. Jacobson, 172 F.3d 144,
166 (2d Cir. 1999) ("Evidence presented at a prior time, however,

29

could not show a violation that is 'current and ongoing.' Hence,

the 'record' referred to cannot mean the prior record but must

mean a record reflecting conditions at the time termination is

sought."); Imprisoned Citizens Union v. Ridge, 169 F.3d 178, 190

(3d Cir. 1999) ("Mere speculation that Defendants might refuse to

honor alleged contractual obligations is insufficient to support

a finding of 'current and ongoing violations of [a] Federal

right.'" (alteration in original)).[20]

---

[20]   Although the Eleventh Circuit in Parrish v. Alabama
Department of Corrections, 156 F.3d 1128, 1129 (11th Cir. 1998)
questioned whether an interpretation that "because no
constitutional violations exist at the jail right now, no
'current and ongoing' violation can exist" was incorrect because
"it could blind courts to violations of federal rights that a
court might reasonably expect to recur soon if the injunction is
dissolved," it too recently concluded that "current and ongoing"
means "a presently existing violation, not a potential, or even
likely, future violation." Cason v. Seckinger, 231 F.3d 777, 784
(11th Cir. 2000). The Eleventh Circuit found determinative, as
we do, the legislative history of the enactment. The phrase
"current and ongoing" was originally enacted as "current or
ongoing"; it was amended in 1997. As the conference report
explaining the significance of the change states:

> These dual requirements [of a current and an ongoing
> violation] are necessary to ensure that court orders do
> not remain in place on the basis of a claim that a
> current condition that does not violate prisoners'
> Federal rights nevertheless requires a court decree to
> address it, because the condition is somehow traceable
> to a prior policy that did violate Federal rights, or
> that government officials are "poised" to resume a
> prior violation of Federal rights. If an unlawful
> practice resumes or if a prisoner is in imminent danger
> of a constitutional violation, the prisoner has prompt
> and complete remedies through a new action filed in
> State or Federal court and preliminary injunctive

Therefore, in order to make the required finding of a
current and ongoing violation of a Federal right required by
§ 3626(b)(3) a court must look at the conditions in the jail at
the time termination is sought, not at conditions that existed in
the past or at conditions that may possibly occur in the future,
to determine if there is a violation of a federal right.
Additionally, the court must also, based on the record, make the
other findings required by § 3626(b)(3).  "The court must make
new findings about whether the relief currently complies with the
need-narrowness-intrusiveness requirements, given the nature of
the current violations.  It is not enough under § 3626(b)(3) that
the orders, when entered, were sufficiently narrow considering
the violations that existed at that time."   <u>Cason</u>, 231 F.3d at
784-85.  This

> requir[es] particularized findings, on a provision-by-
> provision basis, that each requirement imposed by the
> consent decrees satisfies the need-narrowness-
> intrusiveness criteria, given the nature of the current
> and ongoing violation.  It is not enough to simply
> state in conclusory fashion that the requirements of
> the consent decrees satisfy those criteria.
> Particularized findings, analysis, and explanations
> should be made as to the application of each criteria
> to each requirement imposed by the consent decrees.

<u>Id.</u>  We agree with this analysis.

---

relief.

H.R. Conf. Rep. No. 105-405, at § 123 (1997), 1997 WL 712946 (Leg.
Hist.), at *301.

31

In its 1999 order continuing relief, the district court found

> that prospective relief . . . remains necessary to
> correct and prevent a current and ongoing violation of
> the Class Plaintiffs' Federal Constitutional Rights,
> that the temporary injunction extends no further than
> necessary to correct the violation of the Class
> Plaintiffs' Federal Constitutional Rights, and that the
> temporary injunction is narrowly drawn and is the least
> intrusive means to correct the violation.

As a basis for these findings, the court

> considered the arguments made by all counsel at the
> hearing on July 27, 1999, the stipulation made by all
> parties, including the [sic] Daniel Maeso who
> represents the State of Texas, that there [sic] at
> least 289 Blue Warrant persons in Cameron County and
> that the Cameron County Jail would be well over 100%
> capacity of [sic] these 289 Blue Warrant persons were
> incarcerated in that jail, the stipulation filed by
> Cameron County and Plaintiffs on July 29, 1999 and the
> Affidavit of Captain Luis Esparza.  The Court also
> takes judicial notice of all evidence previously
> presented in this case.

Although the language in the 1999 order tracks the requirements

of § 3626(b)(3), it does not reach the needed level of

particularized findings based on the conditions in the jail at

the time termination was requested that is required by

§ 3626(b)(3).  Additionally, there is simply not enough evidence

in the record to support the requisite findings.

The only evidence in the record relevant to whether a

"current and ongoing" violation of a federal right exists, is

that there are 289 Blue Warrant persons outstanding who would put

32

the Jail over design capacity if they were arrested.   There are
two reasons that this is insufficient to support the finding of a
"current and ongoing" constitutional violation.   First, although
overcrowding may give rise to unconstitutional conditions,
overcrowding itself is not per se unconstitutional.   See Rhodes
v. Chapman, 452 U.S. 337, 347-50 (1981).   Second, this threat of
overcrowding was based on a prediction of future activity.   See,
e.g., Watson v. Ray, 192 F.3d 1153, 1158 (8th Cir. 1999)
("[A]ppellant could only point to 'the looming threat of
potential overcrowding' but did not produce any evidence to
support a finding that this threat constitutes a 'current and
ongoing violation' under the PLRA.").

        Moreover, there was no evidence in the 1999 order or in the
record of any analysis or explanation as to the other findings
required by 18 U.S.C. § 3626(b)(3).   For example, we would expect
the court to consider other alternatives before reaching the
conclusion that these injunctions "extend[] no further than
necessary to correct the violation of the Federal right,"
§ 3626(b)(3), and are "narrowly drawn and the least intrusive
means to correct the violation."   Id.

        However, as we note that the record before us contains
almost no evidence regarding current conditions in the Jail and
that all parties offered to present additional evidence on these

33

issues at the July 27 hearing, we conclude that the best course

of action is to remand this case to the district court to hold an

evidentiary hearing on whether the relief meets the requirements

of § 3626(b)(3).


## V. ENTRY OF PROSPECTIVE RELIEF UNDER § 3626(a)

In addition to arguing that the injunctions should be

terminated pursuant to the §§ 3626(b)(1) and (b)(2) termination

provisions of the PLRA, the State also argues that the September

1994 injunction, the 1997 injunction, and the 1999 order should

be terminated because they violate the requirements of

§ 3626(a)(3), which sets out the criteria for the entry of

prisoner release orders (including the requirement for a three-

judge court), and § 3626(a)(1)(B), which sets out the conditions

under which a court can enter prospective relief that allows a

government official to violate state law.[21]

---

[21]    The plaintiffs contend that because these arguments
were not made in the State's initial motion to terminate the
September 1994 injunction, consideration of the issues is
precluded.  We disagree.  "No 'bright-line rule' exists for
determining whether a matter was raised below."  N.Y. Life Ins.
Co. v. Brown, 84 F.3d 137, 142 n.14 (5th Cir. 1996).  The State
made these arguments in its "Advisory to the Court" filed on June
28, 1999, and these issues were debated at the July 27 hearing,
without objection by any party.  Therefore, we hold that these
issues were adequately raised in the district court and we may
consider them on appeal.

In regard to the entry of prisoner release orders, the relevant provisions of § 3626(a)(3) provide:

> (A) In any civil action with respect to prison conditions, no court <u>shall enter</u> a prisoner release order unless—
> (i) a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order; and
> (ii) the defendant has had a reasonable amount of time to comply with the previous court orders.
> (B) In any civil action in Federal court with respect to prison conditions, a prisoner release order <u>shall be entered</u> only by a three-judge court in accordance with section 2284 of title 28, if the requirements of subparagraph (E) have been met.

18 U.S.C. § 3626(a)(3)(A), (B) (emphasis added). As discussed above, we have already found the September 1994 injunction and the 1997 injunction to fit within the PLRA's definition of prisoner release orders. Therefore, we must determine how this provision of the PLRA affects the September 1994 injunction, the 1997 injunction, and the 1999 order.

The State also argues that the September 1994 injunction, the 1997 injunction, and the 1999 order should be terminated because they permit the sheriff of Cameron County to refuse to accept parole violators, in violation of § 3626(a)(1)(B).

Section 3626(a)(1)(B) provides:

> The court <u>shall not order</u> any prospective relief that requires or permits a government official to exceed his or her authority under State or local law or otherwise violates State or local law, unless—

35

(i) Federal law requires such relief to be ordered in
violation of State or local law;
(ii) the relief is necessary to correct the violation
of a Federal right; and
(iii) no other relief will correct the violation of a
federal right.

Id. § 3626(a)(1)(B) (emphasis added). The parties do not dispute
that permitting the Cameron County sheriff to decline to accept
"blue warrant" parole violators into the jail constitutes a
violation of state law. Therefore, we must determine how this
provision of the PLRA impacts the existing injunctions and the
1999 order.

While we agree that the PLRA was intended to apply to
injunctions existing at the time the PLRA was enacted, we do not
agree that the PLRA requires termination of pre-PLRA injunctions
that did not meet the requirements of §§ 3626(a)(1)(B) and
(a)(3). As discussed above, when enacting the PLRA, Congress
specifically provided that "'[Section 3626] shall apply with
respect to all prospective relief whether such relief was
originally granted or approved before, on, or after the date of
the enactment of this title.'" Martin v. Hadix, 527 U.S. 343,
355 (1999) (alteration in original) (quoting § 802(b)(1), note
following 18 U.S.C. § 3626 (1994 ed., Supp. III)).

"'In interpreting a statute, our objective is to give effect
to the intent of Congress. As always, we begin with the language
of the statute itself.'" Ruiz v. Estelle, 161 F.3d 814, 819 (5th

36

Cir. 1998) (quoting Stiles v. GTE Southwest Inc., 128 F.3d 904, 907 (5th Cir. 1997)). Here, the language of the provisions at issue indicates that they apply only when the court is entering relief. Section 3626(a)(1)(B) begins: "The court shall not order any prospective relief." 18 U.S.C. § 3626(a)(1)(B). Similarly, the language in § 3626(a)(3) provides: "No court shall enter a prisoner release order unless. . . ." Id. (a)(3). Relying on the language of the statutes, we conclude that they do not apply when relief was entered prior to the enactment of the PLRA. The Court of Appeals for the Seventh Circuit agrees. See Berwanger v. Cottey, 178 F.3d 834, 836 (7th Cir. 1999) ("To the extent this request was based on 18 U.S.C. § 3626(a)(3), which establishes special requirements for prisoner release orders, it was unfounded. The orders in question long predate § 3626 . . . . The district court did not 'enter' any order in violation of the PLRA.").

In sum, although the PLRA applies to injunctions existing at the time of its enactment, §§ 3626 (a)(1)(B) and (a)(3) apply when relief is entered, whether that occurs by entering new relief or by modifying existing relief. Therefore, the September 1994 injunction and the 1997 injunction cannot be terminated for failure to comply with §§ 3626(a)(1)(B) and (a)(3) because they predated the PLRA and do not constitute the entering of relief.

37

Similarly, the district court, in entering the 1999 order, did not enter new relief, but simply denied the State's motion to terminate the existing relief.  Although the court did expressly state that it was continuing the relief, that language is a mere truism – it did no more than state what would happen by operation of law once the motion to terminate the relief was denied.  No changes or modifications to the injunctions in place were made.

Additionally, we note that "[i]t is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another."  BFP v. Resolution Trust Corp., 511 U.S. 531, 537 (1994) (brackets, internal quotation marks, and citation omitted).  Congress did not explicitly state that failure to comply with these particular provisions is a ground for termination of relief.  In contrast, in § 3626(b), Congress did provide that failure comply with other provisions of the PLRA would be grounds for termination of relief.  See 18 U.S.C. §3626(b)(2).  In fact, § 3626(b)(2), which provides for immediate termination of relief if particular findings were not made when the prospective relief at issue was entered, contains almost the exact same findings criteria as § 3626(a)(1), which sets out the requirements for the granting of prospective relief. If Congress had intended that injunctions issued before the

38

enactment of the PLRA were to be terminated for failure to comply with the requirements of §§ 3626(a)(1)(B) and (a)(3), it would have so provided. Therefore, we find that the September 1994 injunction, the 1997 injunction, and the 1999 order are not terminable for failure to comply with those sections.

## VI. CONCLUSION

On remand the district court must first determine if a continuing and ongoing constitutional violation exists, and, if so, whether the remaining requirements of § 3626(b)(3) are met. However, we note that any modification of the existing relief that constituted the entry of new relief would need to meet the requirements set out in § 3626(a). Additionally, should the existing relief be terminated for failure to meet the requirements of § 3626(b)(3), the plaintiffs are entitled to seek new prospective relief, but that relief must also meet the standards set forth in § 3626(a). The district court should conduct the required hearing and rule on termination as promptly as possible.

Therefore, we VACATE the 1999 order and REMAND the case for further proceedings consistent with this opinion.

39